WILLIAM E. TUTTLE et al., respondents,

*v.*

BENJAMIN S. HARRIS et al., appellants.

[Argued June 19th, 1914.  Decided October 16th, 1914.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Emery, who filed the following opinion:

The complainants in this case have brought suit at law on a mechanics' lien claim against the defendants Apgar Brothers, as builders, and defendant Harris as owner. In this action defendant Harris pleads (among other defences) a release of the lien by complainants. This bill was thereupon filed by complainants charging that the release was obtained from them by fraud of Apgar Brothers, praying its cancellation and that the defendant Harris may be enjoined from setting it up as a defence in the suit at law. The fraud claimed is that the release was signed by complainants on the application of Apgar Brothers, who at the time represented to them that, on presenting the release signed by complainants to Harris, the owner, Apgar Brothers would receive from Harris about $550, the balance due them on their contract with Harris, and would pay $500 of this to the complainants. It is claimed by the bill that at the time of making these representations Apgar Brothers had no intention of paying to complainants the money promised; that immediately after obtaining complainants' signature to the release Apgar Brothers procured the signatures of other lien creditors to the release, upon the same representations and promises to them respectively. The bill further charges that the release, which was executed by complainants on the 11th of November, was not delivered to the defendant Harris until the 20th of November following. At the time the complainants signed the release they supposed that the contract between Apgar Brothers

and Harris had been filed, and on November 18th, 1907, they served a stop-notice on Harris, but on the 21st of November notified defendant Harris by letter that the release was signed by them on the understanding that the sum of money amounting to about $500, which the Apgars expected to receive from him (Harris) on the strength of the release, was to be paid at once to them, that they found Apgar obtained signatures from other parties on the same representation, and that as the release was obtained from them by fraud and had never been delivered to Harris by them, and as no money had been paid to them on it, they notified Harris to pay no money to Apgar Brothers, or to any person for them on account of the construction of the defendant's house. Defendants Apgar Brothers deny specifically any false or fraudulent representations to complainants in order to secure the release, and deny representations or promises of any kind to complainants or any other lien creditor to secure it, alleging that it was signed by complainants and the others on presentation and in the ordinary course of business— that on delivering the release to defendant Harris, the latter, relying on its validity, gave them a check for a portion of the amount due and promised to pay the balance in a short time. Defendant Harris, denying any knowledge or information of the transaction between complainants and the Apgar Brothers relating to the execution of the release, says he received the release and paid out money thereon, relying on its validity, before he received any notice from complainants that its execution was claimed to be fraudulent. The amount of money paid by Harris to the Apgar Brothers on receiving the release is not set out in the answer of either defendant, but on the proofs it appears to have been a payment of $75 only to one of the Apgar Brothers. The balance due on the contract was paid into this court by Harris on December 3d, 1907, upon his filing a bill of interpleader, the proceedings in which have been introduced into this suit by the pleadings and proofs. This interpleader bill was filed against Apgar Brothers and against the complainants and the Loizeaux Lumber Company and W. L. Larrabee, other creditors, who had served stop-notices, and also against Larrabee as claiming to be an assignee of the contract under an assignment

from Apgar Brothers to him, dated November 22d, 1907, and upon which he commenced an action at law on November 27th. On filing this bill and upon paying into court the amount admitted to be due under the contract ($548.50), an *ex parte* interlocutory injunction was obtained against Larrabee's prosecution of his suit. The interpleader bill prayed decree discharging Harris from all liability to any of the defendants, upon this payment into court. The interpleader bill prayed no injunction against Tuttle Brothers, the complainants, but subpœnas on the bill were served upon them on December 7th. On December 10th complainants commenced their suit on the lien claim, and on the filing of a supplemental bill December 17th, an interlocutory injunction against the prosecution of this suit was issued, but at the hearing of the interpleader suit this injunction was dissolved for the purpose of allowing the suit on the lien claim to be pursued. This was upon the ground that the contract not having been filed, the lien claimants could not be required to look to the contract price in the hands of the owner or paid into court on an interpleader. *Schmidt* v. *Eilel* (*Chancellor Magie, 1905*), *70 N. J. Eq. 8; Summerman* v. *Knowles* (*Supreme Court, 1868*), *33 N. J. Law 203; Beckard* v. *Rudolph* (*Court of Errors and Appeals, 1905*), *68 N. J. Eq. 740*, and cases referred to on *p. 744*. The stop-notice given by complainants, it was also held, did not release the lien or stop complainants from afterwards bringing suit on the lien claim. And at the hearing of the interpleader suit, it was directed that for the purpose of protecting the equities of all parties the further hearing of that cause stand over to await the final determination of the lien suit. The issue now, therefore, is upon the validity of complainants' claim to set aside, as against them, the release of lien pleaded in the suit. There is contradictory evidence upon some of the issues, but as to what seem to me the controlling facts, there is little controversy.

The firm of Apgar Brothers was composed of two members, George I. and Theodore Apgar. Complainants, William E. Tuttle, Jr., and Arthur D. Tuttle, partners as Tuttle Brothers, had furnished materials to Apgar Brothers for the erection of defendant Harris' house, and on November 11th, 1907, the

amount of their claim was about $727.65. On or about that date Theodore Apgar applied to Tuttle Brothers to sign a release of lien in order that he might get from the owner, Harris, the balance which was coming to him on the contract, which was stated to be about $550. Theodore Apgar, as I find, conversed with both of the complainants about signing the release, for, although he says that he had no conversation with Arthur Tuttle, Arthur's testimony is positive on the point that he refused to sign without waiting to speak to his brother about it, and that when his brother came in the conversation of Theodore Apgar was with his brother and in his presence, and his brother William then signed the release. William E. Tuttle corroborates this statement. All three agree that in the conversation before the release, Theodore Apgar promised William E. Tuttle to give him $500 as the consideration the Tuttles were to get for the release. The Tuttles say that Apgar told them the money was ready and he could get it on their signing a release, and that he would get the money and bring it directly to them. I think there is no question that the release was signed upon the statement and promise of Theodore Apgar that the money due from Harris, about $550 or $600, was ready to be paid over, and that $500 of this money would be paid to Tuttle Brothers. William E. Tuttle then signed the release in the firm name of "Tuttle Bros." and delivered the release to Theodore Apgar. There does not appear to have been any conversation at that time about procuring any other signatures to the release and there were no other signatures on the paper at the time the Tuttle Brothers signed it. The release, however, was on a regular form of release of lien prepared by the attorney of Harris, or delivered by Harris to Apgar Brothers, for the signatures of several lien claimants, and the releasors became formal parties only by the signatures, their names not appearing in the release itself. The release recited the contract between Apgar Brothers and Harris for the building, and that "we the undersigned have done work and furnished materials for the erection and construction thereof," and that in order to enable the contractors to collect and receive the contract moneys due them, and in consideration of one dollar, the subscribers jointly

and severally released and discharged the building, &c., from
any and all liens under the Mechanics' Lien law, for the pay-
ment of any debt contracted and owing to them for labor per-
formed or materials furnished for the erection and construction
of such building. On November 14th, three days after the
delivery of this release to Theodore Apgar, and as the money
had not been received, Arthur Tuttle applied to both Theodore
and George Apgar, who were then together, and asked them
about the Harris money, but did not then get any money. The
important feature of this evidence is that George, the other
partner, then and before the procuring by him of the Loizeaux
company release, knew of the Tuttle Brothers' release and of
their expectation of receiving money. Between November 14th
and 18th signatures of labor men, whose claims seem to have
been paid, were obtained, and on November 18th George Apgar
took the release to the Loizeaux company, materialmen to
whom Apgar Brothers then owed about $500 on the Harris
contract, and procured the signature of this company to the
release, upon the promise to pay the company the money due
them. This is the statement of Mr. Loizeaux, and his evi-
dence impressed me as reliable. George Apgar's statement is
that he did not promise Loizeaux to pay him all the money due
the company on the job, but that he promised, if the release
was signed, to pay off a note previously given to the company,
which came due on that day. What the amount of this note
was, or whether any note was paid that day by the Apgar
Brothers, does not satisfactorily appear, and George's statement
is not corroborated. Between the time of getting the signatures
of the Tuttle Brothers and the Loizeaux company to the re-
lease, the signature of Larrabee, a materialman whose claim
of $543 had not been paid, had also been obtained. On pro-
curing the Loizeaux company release, George Apgar delivered
the release to Harris, the owner, on the same day, November
18th, and received from him $75. George further swears that
at the time of delivering the release and receiving this payment
on account he told Harris that he wanted the rest of the money
to go to Mr. Larrabee, and on November 22d Apgar Brothers
assigned the money due on the contract to Larrabee.

It seems to me clear that the release signed by Tuttle Brothers and delivered to Harris, the owner, under these circumstances, cannot be set up by Harris as a discharge of the lien. To the extent that Harris has acted on the faith of the release—that is, to the extent of the payment of $75, he is a *bona fide* purchaser without notice, and he is entitled to be indemnified or reimbursed, as a condition of delivering up or canceling Tuttle Brothers' release, but the release was without any consideration, so far as the Tuttle Brothers were concerned, except the promise of Theodore Apgar, one of the partners, acting for the firm, to pay $300 on account of their claim, out of the money to be paid to them by Harris. The release when delivered to this partner, Theodore, was held by him on the faith of this promise and of the intention to carry it out, and when George, the other partner, received the release from his brother, he was bound by his partner's acts and assurances in obtaining the release, and was also bound not to deliver the release unless at the time of delivery he had the intention of carrying out the promise. The Apgar Brothers held the release not as agents of the owner, I think, but as acting for the Tuttle Brothers, in its delivery to the owner, and as to the conditions and objects of the delivery each of the partners was bound by the acts and promises of the other up to the time of the delivery to the owner. Joint action and representation by both partners, either to the Tuttle Brothers or the Loizeaux company was not necessary in order to make the delivery of the release (which became effective only by delivery to Harris) fraudulent against Tuttle Brothers.

If at the time of the delivery of the release by George, one of the partners, to the owner, it is apparent from the evidence that the partners did not then intend that any of the money should be paid to Tuttle Brothers, then the delivery of the release was fraudulent against them, because it was not then intended by the partners to carry out the promises on which it had been procured for delivery. The main contention for the defendants has been that there was no proof of anything but a breach of promise by Theodore, which was admitted, but if I am correct in my view of the real nature of the transaction, and that the real question is whether at the time of the delivery of the release to the owner

the partners had no intention of carrying out the promises to Tuttle Brothers, made to induce their signature to the release, then the actual participation or knowledge of George as to the promises made by the other partner is immaterial. The fraud of the partners consisted in the delivery of the release by one of them on behalf of the firm, with an intention at the time of delivery, of not doing the thing, the performance of which was the inducement to complainants to sign the paper for delivery to the owner, and without which inducement the paper would never have been in the hands of the partners as the agents of complainants for delivery to the owner.

As I have before stated, I think the contractors in delivering the release to the owner were to be considered as agents of and acting for the releasors, but if it be considered that under the facts of the case the contractors were the agents of the owner to procure the release for him, as a condition of payment, the equities of the case in reference to the cancellation of the release are not changed, but are rather strengthened. For if the owner's agent has procured the release by fraud, the owner upon being informed of the agent's fraud, cannot in equity insist upon taking advantage of it and hold the benefit of it. If he does, it becomes his own fraud. *2 Pom. Eq. Jur.* § *909.*

It was also contended for the defendants that by reason of the stop-notice served by complainants on the owner on November 18th, 1907, the complainants are estopped from setting up the lien. Subsequent to this notice, however, and before the owner had made any further payments to the contractors on the faith of the release, the complainants by their letter of November 21st, notified the owner that the release had been fraudulently procured  The bill of interpleader was filed shortly after receiving this notice (December 3d). The *ex parte* payment into court of the balance of the money after the receipt of the letter was at complainants' risk and cannot be considered as a payment to the contractors made in good faith relying on the validity of the release. When the point was raised in the interpleader suit that the stop-notice was a bar to the action on the lien, I held that fact that the suit on the lien was not brought until after filing the original bill of interpleader might affect the question of costs,

but did not destroy the lien claim if it existed or entitle complainants to insist on any estoppel beyond the costs incurred while they were apparently relying on the stop-notice. I still adhere to this view.

I will advise a decree directing the cancellation of the release so far as complainants are concerned and that the defendants be enjoined from proving the paper in question under the plea of release. At the time of settling the decree counsel may also apply in the interpleader suit for such further order or decree as may be proper in view of the decree here advised.

On the rehearing in this cause two questions were argued— *first,* the agency of Apgar Brothers in the delivery of the release of complainants to Harris, the owner, and *second,* the effect of complainants' payment of money into court in the interpleader suit.

On consideration of the arguments and briefs of counsel on the rehearing, I still adhere to the view taken in the conclusions upon both these points. On the first point, it is now insisted on the rehearing that Apgar Brothers were the agents of Harris, the owner, and that Harris, the owner, at the time of receiving the release, not being informed as to any conditions attached to its delivery by the agreement between complainants and Apgar Brothers, is entitled to hold the release as operative according to its terms. On the assumption that Apgar Brothers in delivering the release were complainants' agents and not agents of the owner, it is not a question of the effect of special conditions to the agent uncommunicated to the third person who is about entering into obligations on his part or changing his status at the time of the delivery of the release by reason thereof, but it is a question of now giving the owner without consideration the benefit of the agent's fraud on his principal. To the extent that the owner has acted on the faith of the release of the complainants, he is a *bona fide* purchaser for value, entitled to protection, but beyond this, he is claiming for his own benefit without consideration and against the principal, the protection of the agent's fraud on the principal. The principle of special agency or instruction is not involved.

43

As to the effect of payment into court by complainant in the interpleader suit, the mere payment into court on an *ex parte* application did not extinguish complainants' right to the money. This may be effected by the decree of interpleader, made after hearing parties on the right to interplead and settle their rights to the fund and discharging complainant from liability. *Chosen Friends* v. *Bennett* (*Vice-Chancellor Van Fleet, 1890*), *47 N. J. Eq. 39, 41; Willison* v. *Salmon* (*Court of Errors and Appeals, 1889*), *45 N. J. Eq. 257, 264.* But such effect cannot be given to the *ex parte* preliminary order for payment.

In the interpleader suit no decree for interpleader has yet been made, and the hearing of that suit (until further order) stands over to await the judgment in the lien suit. If the bill of interpleader be dismissed on the hearing, then Harris, the complainant, will be entitled to the repayment of the money paid into court by him to procure the injunction. *Blennerhasset* v. *Scanlon* (*Ir. Chan.*), *1 Hogan 363;* cited *4 Chit. Eq. Dig. 3134–1; Hoggart* v. *Cutts* (*1841*), *10 L. J. Ch.* (*N. S.*) *314.*

Decree in accordance with the conclusion sent to counsel will be advised, and will be settled on motion day, September 9th, unless agreed to by counsel before that date.

*Mr. J. Henry Crane,* for the respondents.

*Mr. Paul Q. Oliver,* for the appellants.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Emery.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, BOGERT, VREDENBURGH, HEPPENHEIMER, WILLIAMS—13.

*For reversal*—None.