Lawrence R. NEWPORT and Roy Hessee, d/b/a Newport & Hessee, contractors, a partnership, Plaintiffs-Appellants,

v.

W. E. HEDGES and Georgia L. Hedges, husband and wife, Defendants-Respondents.

No. 8084.

Springfield Court of Appeals.

Missouri.

June 5, 1962.

Neale, Newman, Bradshaw, Freeman & Neale, F. B. Freeman, O. J. Taylor, Springfield, for plaintiffs-appellants.

John B. Newberry, Springfield, for defendants-respondents.

RUARK, Presiding Judge.

This appeal involves the question as to whether a landowner's property can be subjected to a lien for improvements constructed by the lien claimant under a contract with the lessee.

The lease was dated October 24, 1959. By it (the owners-defendants) Hedges leased to Lloyd and Mary Cramer an ir-

regular-shaped vacant lot located on South Grant Avenue in Springfield, at a rental of $150 per month, to commence on or before January 1, 1960. The term of the lease was ten years with option for renewal for five years. The lessees were given an option to purchase the land at any time during the first seven years at a price of $18,500.

Under a paragraph entitled "Use of the Premises" the lease stated, "It is agreed that the premises are to be used by Lessee for the operation thereof of a Dog 'n Suds Drive-In restaurant building."

Under "Building and Improvements" it was stated that "It is recognized that the premises hereby let and leased are at present a vacant lot, tract and parcel of land. The Parties hereto have discussed and agreed that a one-story building known as a 'Dog 'n Suds' Drive-In is to be erected by the Lessee herein, on this property, in accordance with plans and specifications to be approved by the land owner and in the event the above purchase option is not exercised, this Building shall revert to the owner of the land upon the expiration of the aforementioned ten (10) year primary lease or at the end of the above five (5) year lease option, if same is exercised. As stated before, said building is to be erected by Lessee, and solely at his cost."

Under "Insurance," "Lessee herein agrees to pay all fire and other hazard insurance premiums covering the building to be erected, and shall carry a sufficient amount of insurance to replace the building in the event of loss."

Under "Health and Safety," lessees agreed to comply with all ordinances, laws, et cetera, "provided however, that nothing in this paragraph shall require the Lessee to make or pay for any improvements, repairs, alterations, additions or structural changes to said premises that are not required of Lessee by other terms and conditions in this Lease set out in other paragraphs thereof."

Under "Taxes," lessors agreed to pay taxes and special assessments on the land, and lessees agreed to pay all taxes assessed against any and all improvements placed on the land during the term, said division of taxes to be based on the plats and assessment sheets maintained by the assessor's office.

Under "Failure to Pay Rent or Other Default," lessors might, after notice, immediately dispossess lessees, take possession, and re-rent or re-lease, and "may make such changes, alterations or modifications in the building and premises as might be necessary in order to re-rent the premises."

The "Dog 'n Suds" was a franchised operation described as a drive-in restaurant.

On April 4, 1960, the lessees entered into contract with plaintiffs Newport and Hessee for the construction of a restaurant building at the above site. The contractors were to furnish work and materials "as designated in the plans on sheets 1, 2 and 3 attached," with the exception that "contractor shall not be required to pave with "asphald paving as shown on the plans, but instead shall be required to grade and pave with tar and gravel surface at a cost figure of $1870." The contract further provided for installation of water and gas lines from meter locations. The total price was $16,029, of which $3000 was to be paid when the work was half finished.

The construction was completed sometime that summer. The lessees were unable to pay therefor except the initial $3000, and a lien was filed for the balance. The contractors claim a lien on the whole estate.

The negotiations for the lease were conducted by one Westmoreland (deceased), who acted as agent for the owners. There is no dispute as to the foregoing. The only disputes of fact were (a) as to the value of the vacant lot and (b) as to whether or not the owner-lessor had seen and approved the plans. As to the value, the owner said it is worth $18,500, the option price; that he had purchased the lot in

1956 for "something in the neighborhood of" $3500; that since then he had paid a paving bill in the approximate amount of $1100, a sewer tax bill of about $700, and had the additional cost of getting gas service of $200 or $300; that the $18,500 was about three times what he had in the place but thought that value was justified because of a proposed thoroughfare plan of the city. Defendant was and is an engineer by profession and Director of Public Works and City Engineer of the City of Springfield.

Plaintiffs' evidence from a real estate broker was that the value of the bare lot is $50 per front foot, or a total of $8710. "It's higher than it was in October of 1959."

As to whether the owner had knowledge of and approved the plans: Plaintiff Lawrence Newport, one of the contractors, testified that he went to the city department headed by owner Hedges in order to get a building permit, but "that part of the street hadn't been laid out, and they was in a doubt about that being a dedicated street. And I took those—well, the next day I— Mr. Hedges was out that day—and the next day I went into his office with the plans, and went over them with him, and he showed me the boundaries, and where the utilities would come in." He took the plans to Mr. Hedges' office and laid them on Hedges' desk; Hedges did not go over them in small detail; he and Hedges went over "those boundaries, and all, and the building, and where it was, the street, where the street come in there, so we could get a street number." Over and over the witness insisted that "he went over the plans with me" and that a building permit was issued by Hedges' department subsequently on the same day; that the plans are what is called a "franchised plan" and they had to be altered for the city approval. And such plans, as so altered, were those followed in the construction.

On the other hand, owner Hedges insists that he never approved the plans; that he never saw them until the building was finished; that they were never presented to him for his personal review as an individual; that permits are issued by people in his department who are considered qualified to judge whether they meet the code. "I don't believe I ever did, to my knowledge, I didn't see them until after it was constructed. I came in the office one day, and, here, laying on my desk was a set of plans on this, with no note, or anything, as to who had brought them, or anything else, when I inspected them. I knew where they probably came from, but our office receives many, many plans to review for building permits, and I doubt that I see one out of a hundred on them." But "to the best of my knowledge" he never saw the plans and specifications before the building was finished. He did say he had seen a picture of a "Dog 'n Suds" franchise on a letterhead shown him by Westmoreland. He did know the construction was going on. He saw it a few times as he was driving by on his way to work or lunch. But he did not direct, assist, or suggest in the actual building. Neither did he protest.

Our learned brother below had some difficulty with this case. So do we. Evidence was first heard; then the case was reopened for further testimony. A judgment was rendered, a motion for new trial was sustained, and further evidence was received. Thereafter the court in rendering judgment remarked that "the law certainly needs to be clarified," found that the lease did not require the tenants to build; that the owner did not approve the plans; and denied the lien against the owners' property. From that judgment the contractors have appealed.

The liability of the owner's property for a lien on account of improvements placed thereon by the tenant usually arises, when it does arise, out of an agency implied in law. This agency is found where the lease requires the tenant to make substantial improvements, and also where the premises are let for a specific use or purpose and such purpose cannot be accomplished ex-

cept by the making of substantial improvements. Utley v. Wear, Mo.App., 333 S.W. 2d 787, and the cases cited therein.[1]

█ As we have heretofore said in the Utley case, l. c. 793, the courts have sometimes been required to consider the whole circumstances of the letting. (See 79 A.L.R. 962, 974, anno.; 163 A.L.R. 992, anno.) but that does not mean that the parties can testify to intentions and purposes which are at variance with the written instrument. We must gather the intention of the parties, if possible, from the instrument itself. Curtin-Clark Hardware Co. v. Churchill, 126 Mo.App. 462, 104 S.W. 476, 478; Sol Abrahams & Son Const. Co. v. Osterholm, Mo.App., 136 S.W.2d 86, 92. Neither is it important that the whole project may later have proved to have been mistaken and, as the events later worked out, did not really enhance the value of the property. It is a question of the intention of the parties, to be gathered if possible from their contract at the time of its execution. And the *value* which the owner expects to realize does not necessarily involve any actual increase in the market value. Masterson v. Roberts, 336 Mo. 158, 78 S.W. 2d 856, 858, 97 A.L.R. 862. It may lie in increased rental value and adaptability to use (Weis & Jennett Marble Co. v. Rossi, 198 Mo.App. 35, 198 S.W. 424, 425); in present benefit of the freehold interest (Dierks & Sons Lumber Co. v. Morris, 170 Mo.App. 212, 156 S.W. 75, 78); permanent and substantial improvements which are beneficial to the owner (American Sash & Door Co. v. Stein, 231 Mo.App. 221, 96 S.W.2d 927, 931; Allen Estate Ass'n v. Fred Boeke & Son, 300 Mo. 575, 254 S.W. 858); "substantial betterment" (Dougherty-Moss Lumber Co. v. Churchill, 114 Mo.App. 578, 90 S.W. 405, 406); or in benefit to the

reversionary interest (Powell v. Reidinger, Mo., 234 S.W. 850, 852).

The parties argue pro and con as to whether the tenant was *required by the contract* to put the lot in shape or construct the building. We think the first pertinent inquiry is whether the premises were let for a specific purpose. For if that purpose was definite, then undoubtedly the tenant was "required" to level and pave the lot and put up a building mentioned in the contract in order to accomplish that purpose. Let us examine the lease:

"It is agreed that the premises are to be used by Lessee for the operation thereof of a Dog 'n Suds Drive-In restaurant building." "The parties hereto have discussed and agreed that a one-story building known as a Dog 'n Suds Drive-In is to be erected by the Lessee."

█ Ordinarily the word *agree* in a legal instrument carries the connotation of a contract or an express promissory covenant. Fish v. Fish, Mo.App., 307 S.W.2d 46, 50; Mackay v. Truchon, 171 Mo.App. 42, 153 S.W. 502, 503. The lease does not say that the premises *may* be used for a franchised drive-in restaurant; it says they *are* to be used for that purpose. It does not say that the building *may* be erected; it says it *is* to be built. A thing that "is to be *must* be," and not *may* be. White v. Disher, 67 Cal. 402, 7 P. 826.

█ The fact that the improvements are to "revert" to the owner at the end of the term, although not, alone and in and of itself, sufficient to create the implication in law of the agency, is a factor to be considered in determining the intention of the parties. American Sash & Door Co. v. Stein, 231 Mo.App. 221, 96 S.W.2d 927,

1. Since most of the Missouri cases dealing with this problem are cited in that case, we refer to such without necessity of burdening this opinion with them. In addition, we recommend an article entitled "Rights of a Mechanics' Lienor in Missouri When the Improvements are Contracted for by the Lessee or Licensee of the Land," Maichel, in the Washington University Law Quarterly of 1952, at p. 453. This article traces the growth of this peculiar implied agency and cites or discusses practically every Missouri case on the subject.

932; Ward v. Nolde, 259 Mo. 285, 168 S.W. 596, 600; Curtin-Clark Hardware Co. v. Churchill, supra, 104 S.W. 476, 478; Marty v. Hippodrome Amusement Co., 173 Mo. App. 707, 160 S.W. 26, 27. The fact that the lessees "agreed" to carry sufficient insurance to replace the building in event of loss is some indication it was considered the building was to be of value to the property. Finally there is the provision that the lessees should not be required to make or pay for any improvements, et cetera, "that are not *required* of Lessee by other terms and conditions in this lease set out in other paragraphs thereof." We find *no other* requirements as to improvements in the lease except those contemplated by putting in the drive-in restaurant. This certainly is more specific than the reluctant consent given in Curtin-Clark Hardware Co. v. Churchill, supra, 104 S.W. 476, 477, or the fact that the tenant was "allowed" to make certain changes with the consent of the owner in Martin-Welch Hardware & Plumbing Co. v. Moor, Mo.App., 16 S.W.2d 667, 668.

We cannot escape the conclusion that the parties not only contemplated and intended but also contracted for the operation of a certain business to be conducted on the then unimproved vacant lot; that the construction of the building, if indeed not required by the contract, was required in fact for the operation of such business. Nor can we escape the conclusion that the owner intended to (and probably did) accomplish substantial benefit to both his present and future interest in what was then vacant property. In view of the repeated assertions by the courts to the effect that the mechanics' lien laws are to be construed liberally,[2] our conclusion is that the lessees became by implication of law the agent of the owners whereby the owners' property might become bound for a lien.

■ There remains one other question. It is argued (although not briefed), and in fact the lower court so found, that the owner did not "approve" the plans. Obviously no tenant should be permitted to subject the owner's premises to a lien because of erection of improvements without the express or implied consent or approval of the owner. The facts in this case make, we think, a close question. The lease did not provide for any particular manner or method of "approval."

■ There is no doubt in our minds that Newport went (to the department of which defendant Hedges was in charge) to get a city permit for the proposed improvement. There is no dispute as to his testimony there was some trouble because of doubt as to whether a portion of the street had been dedicated. Nor is there any dispute that the plans had to be altered to comply with city regulations. There is no dispute that defendant was absent from the department the day Newport went in and that Newport returned the next day with the plans and thereafter the permit was issued. The conflict of testimony rests upon the fact that Newport says he laid the plans on Hedges' desk and he and Hedges went over them together and Hedges pointed out certain things. Hedges, on the other hand, says that "to the best of my knowledge" he never saw the plans until after the building was completed. Hedges, the engineer, knew from the contract itself that a franchised drive-in restaurant was to be constructed, and after the permit was issued he knew that the construction was going on on his property. Occasionally he would drive by but never stopped to look at it or ask questions. Nor did he object. His attitude was, and his memory of the whole affair is, that of a curiously incurious person. We can defer to the finding of the trial judge to the extent that Hedges did not "approve" of the plans in the sense of putting any personal stamp on them or giving any written formal acknowledgment of approval, but we are further of the opinion

---

2. Ladue Contracting Co. v. Land Development Co., Mo.App., 337 S.W.2d 578, 584; Herrman v. Daffin, Mo.App., 302 S.W.2d 313, 316; Concrete Engineering Co. v. Grande Bldg. Co., 230 Mo.App. 443, 86 S.W.2d 595, 607.

that he by his conduct gave tacit or implied approval. *Approve* means to sanction officially, to ratify, to confirm [Webster's New International Dictionary (2nd ed.), p. 133]; to sanction, consent to, confirm, or to be favorable toward [Webster's New World Dictionary (college ed.), p. 72]. And one may approve, acquiesce, affirm, accept, alter, or abandon in express words, or such may be implied from the conduct of the parties.[3] Defendant may not now, after such approval, be permitted to realize the fruits of others' labor and material which have materially benefited his property.

For the reasons aforesaid, the judgment is reversed with directions to enter judgment for the lien in accordance with the prayers of plaintiffs' petition.

McDOWELL, J., concurs.

STONE, J., not sitting.

3. 12 Am.Jur., Contracts, § 356, p. 922; 17 C.J.S. Contracts § 514b(1), p. 1101, § 375, p. 861; 3 C.J.S. Alteration of Instruments § 60, p. 975; 94 C.J.S. Wills § 11, p. 689; Woolfolk v. Jack Kennedy Chevrolet Company, Mo.App., 296 S.W. 2d 511(2, 4); Schwartz v. Shelby Construction Co., Mo., 338 S.W.2d 781, 788; Brown v. George, Mo.App., 260 S.W.2d 836, 839; Stauffer v. Joplin Lumber Co., Mo.App., 207 S.W.2d 825, 828-829; Scarritt v. Kansas City & S. Ry. Co., 127 Mo. 298, 29 S.W. 1024, 1025.