**MID-WEST ENGINEERING & CONSTRUCTION CO., a Corporation, Plaintiff-Appellant-Respondent,**

**v.**

**Joseph A. CAMPAGNA, Randolph Development Corporation, a Corporation, and Campagna Corporation, a Corporation, Defendants-Appellants,**

**Andrew Sansone and Roads Realty, Inc., a Corporation, Defendants-Appellants-Respondents,**

**Victor Zeppenfeld and Helen Zeppenfeld, Defendants,**

**Precon Concrete Products Company, a Corporation, Defendant-Respondent,**

**Val Baker Company, Inc., a Corporation, Phil L. Miller Plumbing & Heating Company, a Corporation, E. A. Koeneman Electric Co., a Corporation, and H. A. Dailey, Inc., a Corporation, Defendants-Appellants.**

**No. 50992.**

Supreme Court of Missouri,

Division No. 1.

Sept. 13, 1965.

Motions for Rehearing or to Transfer to Court En Banc Denied and Opinion Modified on Court's own Motion Oct. 13, 1965.

Motion to Modify Opinion Further Denied Jan. 10, 1966.

Shifrin, Treiman, Agatstein & Schermer, Sylvan Agatstein, St. Louis, for Mid-West Engineering & Const. Co.

Jerome Kalishman, Blumenfeld, Kalishman & Tureen, Melvin L. Hertzman, St. Louis, for Joseph A. Campagna and Campagna Corp.

Ackerman, Schiller & Schwartz, Gideon H. Schiller, Clayton, for Andrew Sansone and Roads Realty, Inc.

Oliver F. Erbs, Kirkwood, and Edward L. Sprague, Clayton, for Phil L. Miller Plumbing & Heating Co.

WELBORN, Commissioner.

This is an equitable mechanic's lien action. Various contractors and materialmen who furnished labor and materials for the construction of a building for the sublessee from an assignee of a 99-year lease sought to establish liens against the interest of the original lessee, his assignee, and the owner of the fee of the tract on which the building was erected. A referee appointed by the trial court heard the testimony and made findings, recommending that, except as to two of the claimants, the liens be allowed. The trial court originally accepted, in essence, the recommendations of the referee. On motions for rehearing, the trial court amended its judgment to deny, except as to one claimant, liens against the interests of the original lessee, his assignee, and the owner of the fee. Appeals followed by the parties seeking to obtain liens, and by the owner and 99-year-old lease assignee, seeking to have disallowed the lien allowed by the trial court to one claimant. Certain appellants also seek to be relieved of general judgments in amounts in excess of $15,000.00.

Andrew Sansone was the owner of a 300 ft. by 300 ft. unimproved tract located at the northwest corner of Clayton Road and Brentwood Boulevard, in St. Louis County. On May 27, 1954, Sansone entered into a 99-year ground lease with Victor Zeppenfeld. The rental specified was at the rate of $500 per month "until at least one store on the demised premises is occupied; thereafter for the first 25 years a rental of $1,375.00 per month; and thereafter the sum of $1,500.00 per month." The lease contained the following provision:

"4. Lessee or the Lessee's assigns shall have the right and privilege to and do hereby agree to erect on the above described property a commercial building or buildings costing not less than One Hundred Thousand Dollars ($100,000.00), provided, however, that upon the completion of said building or buildings, all claims and demands of every kind and character arising out of or in connection with the construction and erection of the said commercial building for work, labor and materials shall be fully paid and discharged by Lessee, and said building and premises are to be free and clear of all liens for any such work, labor or materials. Lessee shall not, however, commence building on the demised premises until adequate arrangements have been made for the financing of same and prior to such building Lessee shall deliver to Lessor the commitment of a reputable insurance company, bank or other lending agency for a loan to Lessee with respect to said building in the sum of One Hundred Thousand Dollars ($100,000.00) or more, which commitment shall be addressed both to Lessee and to Lessor."

Through mesne conveyances, Zeppenfeld assigned the lease to Roads Realty, Inc. (referred to herein as "Roads"), a corporation which became the assignee of the lease on August 4, 1954. Roads was apparently a Zeppenfeld family owned corporation. Although Victor Zeppenfeld was not a stockholder of Roads, he subsequently became vice-president of that company. He was president of Zeppenfeld, Inc., which, according to him, "had the broadest authority to handle a matter pertaining to (Roads') * * * property * * *." In such capacity, Victor Zeppenfeld apparently exercised wide authority in the transactions here under consideration. References herein to "Zeppenfeld" are to him.

Joseph A. Campagna was at that time a successful St. Louis builder and real estate developer. He was president of Campagna Corporation, which was engaged in the business of building, general contracting and management of real estate. Together with other investors, Campagna became in-

terested in the development of the Sansone tract. Campagna and his fellow investors organized a corporation, Randolph Development Corporation (referred to herein as "Randolph"), of which Campagna was president, to develop the tract. On January 25, 1955, Roads subleased the tract to Randolph for the remainder of the original 99-year term at a ground rent of $700 per month until May 26, 1955; $1,500 per month until May 26, 1956; $2,100 per month until December 31, 1959, and $2,500 per month thereafter. By the lease, Randolph covenanted and agreed to build or cause to be built on the premises a commercial building at a cost of not less than $750,000.00.

On June 30, 1955, the Randolph stockholders entered into an agreement with Joseph A. Campagna, John J. Campagna and Donald J. Meyer (Campagna's attorney and secretary and a stockholder of Randolph), to which Randolph was a party, for the development of the Sansone tract. Joseph Campagna agreed "to be responsible for the construction and delivery to Randolph * * * of (an) office building" at a cost of $1,100,000.00. The plan called for the construction of a building for doctors' offices. Some preliminary work on the project, including excavation work, got under way. However, the project fell through and the site remained undeveloped.

In the spring of 1958, Milford Soffer became interested in the erection of a bowling alley on the tract. He asked Sidney Bierman, President of Mid-West Engineering & Construction Co. (referred to herein as "Mid-West"), to prepare cost estimates for the project. At Soffer's suggestion, Bierman got in touch with Campagna to explore the possibility of a construction contract.

Campagna was interested in the bowling alley project. However, because the income from the bowling alley building would be less than the ground rent for the entire tract, division of the tract into two separate parcels was necessary in order to secure financing for the project. Such division was agreed upon between Campagna and Zeppenfeld on behalf of Randolph's lessor,

Roads. On April 16, 1958, Roads and Randolph executed a cancellation of the original lease between them and entered into two separate subleases under which the tract was divided into two parcels, Parcel A and Parcel B. Parcel A, upon which it was contemplated that the bowling alley should be built, fronted 185 feet on Clayton Road and had a depth northwardly of 165 feet. Parcel B was an L-shaped lot fronting 115 feet on Clayton and having a depth of 300 feet on the west line of Brentwood Boulevard, including the 135-ft. strip north and to the rear of Parcel A. Each of the subleases contained a provision whereby the lessee covenanted and agreed to erect improvements on each tract, at a cost of not less than $200,000 on Parcel A and not less than $600,000 on Parcel B. The ground rent for Parcel A was $750 per month for the entire term. For Parcel B, the ground rent was $1,350 per month until December 31, 1959, $1,466.67 per month to December 31, 1960 and $1,750 per month for the remainder of the term. Each lease provided that no materials should be furnished or used nor any labor performed in connection with the construction of the buildings unless lien waivers were delivered to lessor or proper bond therefor provided lessor.

On April 21, 1958, J. A. Mattus, sales manager of Mid-West, submitted a written proposal, addressed to Campagna Corporation, whereby Mid-West offered to construct the "Cross Roads Bowling Lanes." As subsequently amended, the proposal set a base price of $95,000, with alternates and extra items which produced a total price of $126,800.00. The proposal was for the construction of the building shell according to plans prepared by Campagna's architect. On April 29, 1958, Joseph Campagna executed the proposal on behalf of Campagna Corporation and returned it to Mid-West for its acceptance.

Although Mid-West did not indicate its acceptance of the proposal in writing until July 23, 1958, construction of the project got under way about May 10, 1958. Zeppenfeld and Sansone were aware that construction of the bowling alley was under

way. Zeppenfeld visited the project site frequently after the work began, although it was not shown that Sansone was ever at the job site.

On May 21, 1958, Bierman received a Dun & Bradstreet report on Campagna which indicated that the latter's credit standing was poor. Mid-West was to be paid by the tenth of the following month for the work completed during the preceding month, less a 10% holdback. Mid-West billed Campagna Corporation $8,500 for work during May, but the bill was not paid by June 10. Bierman talked to Campagna shortly after that date and was promised that the account would be paid. However, payment was not forthcoming as Campagna had not obtained financing for the project. Nevertheless, the work continued and, as of June 30, the amount owed Mid-West was $37,169.12. Bierman made repeated calls to Campagna, demanding payment, but no money was forthcoming.

When payment of the account was not made on July 10, Bierman arranged a meeting with Campagna which was held at the latter's office the following day. At that meeting, Campagna told Bierman and Ralph Teich, President of H. A. Dailey, Inc., a Mid-West subcontractor, that payment was "just a matter of making final arrangements to get this money from the lending agency." Work on the project continued, but when no money was received, Bierman wrote Campagna Corporation on July 17, 1958:

"We have not, as of this writing, received the money you promised at our last meeting, on July 11th, in your office.

"Although I have made repeated calls to your office I have not received a reply from you or any badly needed money on our past due account.

"Mr. Ralph Teich has advised us this date that he is stopping all of his work until he gets at least twenty thousand dollars in payment of his old accounts.

"We must also advise you now that after Friday, July 18, that we also will be forced to shut the job down unless payments as promised are received."

In the meantime, Zeppenfeld had been pushing for compliance with the terms of the Roads-Randolph lease, requiring lien waivers on the construction. Campagna told Zeppenfeld that he had a verbal commitment from the Equitable Life Assurance Society for financing the project and promised to give a written commitment to Zeppenfeld as soon as "I get it from them." Sometime in May after the construction started, Campagna told Zeppenfeld that he had some waivers, but would wait until he had all of them before giving them to Zeppenfeld. At one time Zeppenfeld threatened to seek an injunction to halt the project unless the terms of the lease were met, but he took no such action.

On July 18, 1958, Sansone's attorney wrote Zeppenfeld, calling attention to the requirement of the Sansone-Zeppenfeld lease that a commitment for financing be furnished Sansone before construction was begun on the leased premises, and stating that no such commitment had been furnished Sansone. "On behalf of our client, we hereby request that a commitment for a loan complying with the provisions of Section 4 of the above lease be delivered forthwith to Andrew Sansone. Your failure to provide such a loan commitment would, of course, be a default under this lease."

On Monday, July 21, 1958, Zeppenfeld dispatched a telegram to Campagna, stating: "My lessor notified me to comply with Section 4 as to financing building forthwith. Failure to provide a written commitment would cause a default forthwith. Please advise me today."

On the same date, July 21, 1958, Campagna addressed a letter to Mid-West, in which he stated:

"In accordance with arrangements I made with you when I telephoned right after I received your letter of July 17th and as confirmed when I called you at home yesterday, I am enclosing cashiers check in the amount of $29,000, on account of your contract. I have endorsed this check to you. Although this payment is somewhat less than shown on your requisition as of

June 30, 1958, you did say at our meeting on July 11th that approximately this amount would be perfectly acceptable."

The $29,000 check was not enclosed. Enclosed were lien waivers which Campagna asked to be executed by Mid-West and Dailey. In response to Campagna's invitation, a meeting was held in the office of Mid-West's attorney, Ervin Tzinberg, on July 23. Present at that time were Tzinberg, Bierman, Campagna and Donald Meyer. At that time, work in July had brought the amount owed Mid-West to in excess of $50,000 and Tzinberg told Campagna that Mid-West could go no further without money. According to Tzinberg, Campagna stated that permanent financing had been arranged with Equitable and that in order to get temporary financing from his bank, it was necessary that he have the lien waivers; that he couldn't get the money without the lien waivers; "that as soon as he could get lien waivers, temporary financing from * * * Easton-Taylor Trust Company, would be forthcoming and that monies would be available for payment." On the basis of Campagna's statement, Tzinberg advised Bierman to execute the lien waiver provided Mid-West also got a conditional assignment of the lease as additional protection. Campagna was agreeable to such proposal and Tzinberg prepared a conditional assignment of the lease to Randolph to Mid-West. The assignment document contained the following recital:

"WHEREAS, for the purpose of obtaining financing to complete said building, Second Party (Randolph) requires that First Party (Mid-West) at this time and prior to payment of amounts now due and which will become due for labor and materials, execute a lien waiver whereby First Party will release all its right to a mechanic's lien for work done and materials furnished to this date and for all labor and materials to be furnished hereafter to complete its contracts for portions of said building;

* * * * * * ."

The assignment was to become absolute if Randolph failed to pay the amount due under the contract with Mid-West within thirty days after the amount became due. In addition to the execution of the conditional assignment, the proposal which Mid-West had originally submitted to Campagna Corporation in April for the contruction of the building was accepted by Bierman's signing it on behalf of Mid-West. In addition, the names "Joseph A. Campagna" and "Randolph Development Corporation" were added as addressees of the proposal. On the final page of the proposal the name "Randolph Development Corporation" was typewritten above a line below which appeared the word "Purchaser." Below that word was the handwritten signature of "Joseph A. Campagna Pres." and the date "July 23, 1958." Farther below appeared the typewritten words "The Campagna Corporation" and the handwritten signature "Joseph A. Campagna, Pres." and farther below that the handwritten signature "Joseph A. Campagna" above the typewritten name "Joseph A. Campagna."

Bierman executed on behalf of Mid-West a waiver of lien, bearing the date April 21, 1958, by which, for a stated consideration of $1.00 and "other benefits," Mid-West waived any and all liens on the bowling alley tract.

Although the documents, except for the lien waiver, bear the date July 23, they may have been executed the next day in Meyer's office, at which time a $29,000 check was delivered to Bierman. Mid-West paid Dailey $19,500 of the amount received and the project continued.

Campagna had, in fact, been negotiating with the Equitable Life Assurance Society for a permanent loan on the project. According to Campagna, he considered that he had a verbal commitment from them for a $120,000 loan. On July 21, 1958, Campagna wrote the Equitable representative in St. Louis, requesting an increase in the amount of the permanent mortgage commitment to $135,000.00. By letter dated July 31, 1958, Equitable notified Randolph that they were "unable to comply with your request for permanent financing in the amount of $135,000.00." The letter stated that an application for a $100,000 loan

would be entertained, provided the minimum rent from the bowling alley was increased from $28,000 to $30,000 per annum.

Campagna had, in the meantime, obtained lien waivers from other contractors on the job. Phil L. Miller Plumbing & Heating Company (referred to herein as "Miller") was the contractor for plumbing, sewering, heating and air conditioning work on the project. Miller's proposal for its work, dated July 18, 1958, was addressed to Campagna Corporation. It was accepted on behalf of that corporation and Randolph by Joseph A. Campagna on July 23, 1958. By a letter dated July 24, 1958, Campagna transmitted to Miller for execution five copies of a lien waiver dated July 18, 1958. The letter referred to a conversation in Campagna's office where Miller's proposal was accepted the previous day. According to Miller's president, who executed the waiver, Campagna at that time told him that the waiver was necessary to secure financing for the project.

Val Baker Company, Inc. (referred to herein as "Baker"), entered into a contract with Campagna Corporation and Randolph to install acoustical ceilings in the building. Baker's proposal was dated July 23, 1958, and was accepted by Campagna Corporation and Randolph on July 24, 1958. In conjunction with the contract, the president of Baker executed a lien waiver dated July 23, 1958 upon Campagna's representation that the waiver "would help him on the financing of the project."

At Bierman's request, the president of H. A. Dailey, Inc. signed a lien waiver for the reinforced concrete work and cement finishing done by that company. The waiver was transmitted to Campagna.

Meyer called Zeppenfeld and told him that the lien waivers had been obtained. At Zeppenfeld's suggestion, Meyer mailed the original waivers to Sansone's attorney and sent Zeppenfeld conformed copies.

Meyer's letter to Sansone's attorney on the letterhead of The Campagna Corporation was dated July 29, 1958. In the letter, Meyer stated:

" * * * I am enclosing the following:

"1. Lien waiver executed by Midwest Engineering and Construction Co., the general contractor.

"2. Lien waivers executed by all subcontractors (Phil L. Miller for plumbing, heating, and air conditioning, E. A. Koeneman Electric Co., for electrical work, Val Baker Co. for flooring, acoustic ceilings, etc.).

"3. Photostatic copy of performance and payment bond of Fidelity & Casualty Co. of New York.

"The above enclosures provide complete protection to Mr. Sansone against the possibility of liens being placed against the property as a result of the construction of the bowling alley building. * * *"

The financing not having materialized, Mid-West's invoice for its July work in the total amount of $44,441.25 was not paid by August 10. Mid-West continued to receive nothing but promise of payment upon conclusion of the soon to be accomplished financing, but no money was forthcoming. On August 27, 1958, Mid-West filed its conditional assignment of the Randolph lease in the St. Louis County Recorder's Office.

Although Mid-West did no more work after August 18, Mid-West's subcontractor, Dailey, continued to work until September, producing invoices from Mid-West totalling $23,309.60 for August and $2,326.60 for work until September 12, when the entire job stopped.

Campagna finally told Bierman that he had been unable to obtain financing for the job, and, except for a $5,000 payment directly to Dailey in September, no further payment was made for the job.

On September 2, 1958, Tzinberg wrote Campagna Corporation, demanding the return of the Mid-West lien waiver, stating: "Since the lien waiver was executed by Mid-West as a result of representations it was needed for financing and since you evidently did not obtain financing, * * * I make demand upon you for the return

forthwith of that instrument." No reply to the demand was received.

Zeppenfeld attempted to have Mid-West take over the project, but Bierman declined to do so. In September, 1958, Roads gave Randolph notice of the forfeiture of both of the leases for nonpayment of rent and forfeiture was later declared by an equity action in the St. Louis County Circuit Court. Roads thereupon undertook to complete the construction of the bowling alley at a cost of $170,814.32 and upon completion, the building was rented to an operator.

Mid-West filed its equitable mechanic's lien action in the St. Louis County Circuit Court on January 13, 1959. In addition to a lien on the entire 300 ft. tract, Mid-West sought a general judgment for $73,236.37 against Joseph A. Campagna, Randolph Development Corporation and Campagna Corporation. Defendants Joseph A. Campagna and Campagna Corporation filed a cross-claim for a lien and for a general judgment of $161,474.02 against Randolph Development Corporation. Defendant Precon Concrete Products Company (referred to herein as "Precon") asserted a lien and counterclaimed against Mid-West for a general judgment of $59,863.65. Precon's claim was for precast concrete joists and prestressed concrete girders which it claimed to have furnished as a subcontractor on the building. Defendant H. A. Dailey, Inc. sought a lien and a general judgment of $9,932.92 against Mid-West and Precon. Defendant Val Baker Company, Inc. sought a lien and a general judgment of $1,956 against Campagna Corporation and Randolph. Phil L. Miller Plumbing & Heating Company asserted a claim of $22,822.00 against Randolph and Campagna Corporations and sought a lien as to $20,168.40 of that amount. Defendant E. A. Koeneman Electric Company sought a general judgment against Randolph and Campagna Corporations of $6,577.08, and a lien as to $3,326.30 of that amount. At the hearing, the Koeneman lien claim was reduced to $2,739.26.

The lien claim of defendants Campagna and Campagna Corporation included the amount sought to be recovered by all other lien claimants, plus additional sums which they alleged to have spent. These defendants sought liens on the theory that they were the general contractors for the project under a contract with Randolph. The lien claim of Mid-West included the lien claims of Precon and Dailey.

As a defense to the lien claims, Roads and Sansone denied that they were parties to any contract for the construction of the building. They also asserted that the lien claimants had executed lien waivers which precluded their assertion of liens. As to Mid-West, Roads and Sansone also alleged that the assignment of the lease to it by Randolph was in payment of its claim and that the assignment merged Mid-West's lien into the leasehold interest, thereby extinguishing any such lien. Randolph also, by its answer, asserted that the assignment of the lease to Mid-West extinguished the obligation of Randolph to Mid-West. Roads and Sansone also alleged that any lien should be limited to the bowling alley tract and should not attach to the entire 300 ft. tract. By their replies to Roads' and Sansone's answers, Mid-West, Miller and Baker asserted that their lien waivers were procured through the fraud of Campagna and were of no effect. Precon denied that it had executed a waiver.

The referee found generally the issues submitted and here involved as follows:

1. That as a matter of law the covenants of the original Sansone-Zeppenfeld lease and of the Roads-Randolph subleases regarding construction of improvements constituted Randolph the agent for Sansone and Roads in the matter of improvements.

2. That the lien waivers of Mid-West, Miller, Dailey and Baker were procured by fraud and therefore constituted no defense to their lien claims; that no lien waiver was ever executed by Precon.

3. That the lien waiver of Koeneman was without consideration.

4. That the conditional assignment of the Randolph lease to Mid-West did not prejudice the lien of Mid-West.

5. That Campagna and Campagna Corporation acted as agents of Randolph in promoting the building of the project, but that they had no contract with Randolph to build a building or furnish work, labor or materials and therefore there was no basis for a lien in favor of Campagna and Campagna Corporation.

6. That the improvements were located within both Parcel A and Parcel B of the 300 ft. tract as divided by the two leases of May 1, 1958, and that, therefore, the lien should attach to the entire tract.

The trial court by its original judgment confirmed the findings of the referee, except for its finding that the Koeneman lien waiver was supported by consideration and was therefore valid as to Parcel A which it purported to cover. The court also rejected the conclusion that the Dailey waiver had been procured by fraud. The court found that such waiver was not executed because of fraudulent facts or information to Dailey's president. It entered general judgments in favor of the creditors and against the debtors as above shown and in the amounts claimed, except that the general judgment in favor of Koeneman was for $3,276.98. Mid-West, Precon, Baker and Miller were granted liens as to the entire tract and Koeneman and Dailey as to Parcel B.

In response to after-judgment motions, the court amended its judgment to hold that any liens applied only to Parcel A by reason of the fact that the construction of a part of the improvements on Parcel B was through mistake and was not contemplated by the parties and was not authorized by the lease from Roads to Randolph so that Randolph was not the agent for Roads as to any improvements on Parcel B. The court further amended its finding to conclude that, although the lien waivers were obtained by fraud, Randolph, Campagna and Campagna Corporation were not agents of Sansone and Roads for the purpose of procuring such waivers, that the fraud involved in their procurement was not imputable to Sansone and Roads and that the

lien waivers furnished them were valid and binding. The judgment was accordingly amended to order the same general judgments as originally adjudged, but a mechanic's lien was awarded only to Precon as to Parcel A for $59,863.65, this on the theory that no lien waiver had been executed by Precon.

From the amended judgment, Roads and Sansone, Mid-West, Baker, Miller, Koeneman, Dailey, Campagna and Campagna Corporation have appealed. Koeneman has filed no brief in this court. Therefore, its appeal is deemed to have been abandoned. Although it filed notice of appeal, Dailey has not prosecuted its appeal because its lien claim is included in Mid-West's claim and it "will succeed or fail with respect to its lien claim along with Mid-West." Except for the general judgment of Mid-West from which Campagna and Campagna Corporation seek to be relieved, no issue is here presented as to the general judgments below or their amounts.

*May the interests of Sansone and Roads be subjected to liens for the work on behalf of Randolph?*

Sansone and Roads here contend that a lease containing a covenant to build does not enable the tenant's unpaid contractors to lien the landlord's reversion unless (a) there is a present benefit to the freeholder, or (b) the tenant is, in fact, doing the work for the lessor.

■ Our cases hold that, whenever a lease contains a covenant by which the lessee obligates himself to make improvements of a substantial and permanent nature, the lessee, in making such improvements, becomes, as a matter of law, the agent of the lessor for the purpose of subjection of the lessor's reversionary interest to a mechanic's lien. Allen Estate Ass'n v. Fred Boeke and Son, 300 Mo. 575, 254 S.W. 858; Newport v. Hedges, Mo. App., 358 S.W.2d 441; Utley v. Wear, Mo. App., 333 S.W.2d 787. See Note, "Rights of a Mechanics' Lienor in Missouri When the Improvements are Contracted for by the Lessee or Licensee of the Land," Wash-

ington University Law Quarterly, 1952, p. 453.

Here, the owners of the reversionary interests argue that the application of this doctrine requires a present benefit to the freeholder when there is in fact no agency relation. They rely on Dierks & Sons Lumber Co. v. Morris, 170 Mo.App. 212, 156 S.W. 75. In that case, the court stated: "Passing to our decisions, we find that every one of them which hold that the fee is bound by the lien do so only after examining the facts to see whether or not the lessee is in fact doing the work for the lessor, or whether the improvement is for the present or immediate benefit of the reversionary or freehold interest." 156 S. W. 78. However, in a case such as this, involving construction of a substantial building on previously undeveloped property, the benefit to the reversionary interest is obvious and presumed. Allen Estate Ass'n v. Fred Boeke & Son, supra, 254 S. W. l. c. 862.

The fact that no time for the construction of the improvements was fixed in the leases here does not prevent attachment of liens to reversionary interests. Obviously, the parties contemplated that the improvements would be made within a reasonable time. As a practical matter the leasehold interests were otherwise worthless.

We, therefore, conclude that the referee and the trial court properly held that the interests of Roads and Sansone might be subjected to mechanics' liens arising out of the construction of the improvements called for by their leases.

*Were the mechanic's lien waivers procured by fraud?*

The referee found that Mid-West, Baker and Miller had proved the fraud which they pleaded in avoidance of the lien waivers which they executed. He found that the representations of Campagna that such waivers were required in order to complete financing arrangements induced the execution and delivery of the waivers and that such representations were false and were

of material, present facts. The trial court accepted the referee's findings in such regard.

On this appeal, counsel for Sansone and Roads attack these findings on numerous grounds. They contend that the representations did not pertain to existing facts; that the lien claimants, in executing such waivers, did not rely upon Campagna's representation that they were necessary in order to conclude financing; and that the claimants had no right to rely upon such representations but were obliged to inquire into the truth thereof.

We agree with the referee and the court below that Campagna's representations were of existing facts. Campagna's letter of July 21, 1958 to Mid-West stated that the lien waivers were needed "for the purposes of * * * over-all financing * * *." Tzinberg testified that Campagna said that "nothing other than lien waivers was required to conclude financing arrangements." Tzinberg further testified that at the meeting of July 23, Campagna stated that permanent financing in the amount of $125,000 had been arranged and that "in order to get his temporary financing from his bank, it was necessary that he have the lien waiver." Bierman testified that Campagna stated that lien waivers were necessary in order to get money from the bank and that the waivers were the last detail that had to be cleared up before he could draw on the account.

Miller's president testified that he executed the lien waiver on behalf of his company upon Campagna's representation that there was an immediate need for the waiver "to make the final loan—the final preparation to secure the money to pay the contractors." Testimony on behalf of Baker was that Campagna represented that the waiver was necessary for financing the project in order that the contractor could be paid.

Such representations were of an existing fact as to the current status of financing operations. Stallings v. Bone, Mo.App., 327 S.W.2d 513, 516–517(2); Metropolitan Paving Co. v. Brown-Crummer Inv. Co., 309 Mo. 638, 274 S.W. 815, 823(20–21).

They were shown to have been false. Documentary evidence showing the status of Campagna's financing efforts at the time of the representations showed no demand from either Easton-Taylor Trust Company or Equitable that lien waivers be furnished. The evidence showed that the temporary financing through the bank was not dependent upon the presentation of lien waivers, but involved numerous conditions, the principal one being a commitment for permanent financing which had not been obtained. The fact that the requests for lien waivers were presented to the contractors following the receipt of Zeppenfeld's demand leaves no doubt in our mind that the referee's conclusion that the lien waivers were in fact needed by Campagna to satisfy the demands of Roads and Sansone is correct.

Sansone and Roads further contend that the lien waivers were not in fact executed by Mid-West, Baker and Miller by reason of the representations of Campagna, but that in the case of Mid-West they were issued as a part of an over-all transaction in which Mid-West obtained the additional signatures of Randolph Corporation and of Campagna personally on its construction contract, the payment of $29,500 on account and additional security of a conditional assignment of the Randolph lease. As for Miller and Baker the argument is that their lien waivers were in fact executed simultaneously with their contracts with Campagna and were issued in order to obtain such contracts and not as a result of Campagna's representations.

◼ In our opinion the referee and trial court properly concluded that the lien waivers were executed as the result of false representations of Campagna regarding the status of financing and the use to which the waivers were to be put. Bierman testified quite specifically that Campagna's statements related the execution of lien waivers to the financing needs. Both Baker and Miller offered testimony that similar representations were made to them. In our opinion, these representations did constitute the inducement for execution of lien waivers.

◼ Particularly as to Mid-West the argument is advanced that, even though reliance was placed upon Campagna's representations, Bierman in so relying was negligent in failing to investigate the status of the financing and therefore cannot now defend on the grounds of fraud. According to the argument, Campagna mentioned that financing arrangements were being made with the Easton-Taylor Trust Company and the Equitable Life Assurance Society and only a telephone call from Bierman was required to verify the status of the arrangements and to disprove Campagna's representations. However, in this case, Campagna had made distinct and positive representations of fact. There was no reason at that time for Bierman, in view of Campagna's standing in the community, to doubt Campagna's veracity. Campagna's statements were made in the presence of his attorney. The representations were made for the purpose of inducing Bierman to execute the lien waivers. This was in fact done. Under all of these circumstances the doctrine of notice and means of knowledge is not applicable. Kearns et al. v. Sparks et al., Mo.App., 260 S.W.2d 353, 359(8); Judd v. Walker, 114 Mo.App. 128, 89 S.W. 558, 563; Cantley v. Plattner, 228 Mo.App. 411, 67 S.W.2d 125, 130(6–12); Shechter v. Brewer et al., Mo.App., 344 S.W.2d 784, 787–789 (1–4).

*What is the effect of Campagna's fraud on the lien claimants' right to a lien against the interests of Roads and Sansone?*

The referee concluded, and we believe correctly, that Campagna acquired the lien waivers which he solicited in order to satisfy the demands of Roads and Sansone rather than to meet any conditions laid down by his prospective lenders precedent to the consummation of financing. Inferentially the referee further found that the fraud of which Campagna was guilty

was attributable to Randolph, Roads and Sansone on the theory, among other things, that Campagna was ordered and directed by those parties to procure the lien waivers on their behalf. The trial court originally confirmed this finding, but upon post-judgment motions amended its conclusion to hold that Roads became the agent by operation of law for Sansone by reason of the requirements of its lease for the construction of improvements and that in turn Roads' lessee, Randolph, became the agent by operation of law for both Sansone and Roads, but only "to the limited extent that work done or materials furnished under said agent's contracts for the designated improvements became lienable against the interests of Roads and Sansone." The court further concluded that Randolph and in turn Roads were not the agents of the owners of the reversionary interests "for the purpose of procuring lien waivers or incurring liabilities for their principals." By reason of such conclusion the court held that the fraud of Randolph, Campagna and Campagna Corporation was not imputable to Sansone and Roads and therefore the lien waivers which were furnished them were valid, binding and subsistent. On this appeal the lien claimants urge that the referee properly determined the issue of the validity of the lien waivers on the basis of Campagna's agents in procuring the same as the result of the demands of Sansone and Roads.

In making this argument, which is advanced primarily by Mid-West and joined in by the other lien claimants, the lien claimants rely primarily upon cases above referred to in which it has been held that construction covenants such as found in the leases here in question constitute the lessee the agent of the owner of the reversionary interest for the purpose of subjecting the same to mechanics' liens. Examination of the cases holding that an agency arises in such circumstances makes clear that the agency involved is not a typical principal-agent relationship. "It is a special, limited agency which the court

purportedly finds suggested in the statute (Section 429.010, RSMo 1959 [V.A.M.S.]), although the lessor never intends that the lessee should be constituted his agent nor indulges in any acts which would make third parties believe that he had such an intention." Note, 1952 Washington University Law Quarterly, supra, page 455. See Ward v. Nolde, 259 Mo. 285, 168 S.W. 596, 599.

■ In view of the fact that the agency found in the cases relied upon is a creature of our judicial decisions, having a basis in the statutory enactments pertaining to mechanics' liens, we are of the opinion that it should not be extended beyond that particular purpose. See Utley v. Wear, supra. We will not extend the purpose of the agency which arose as a matter of law to the procuring of the lien waivers.

■ Nor do we believe that the fact that Campagna procured the waivers as the result of Zeppenfeld's threats constitutes Campagna Zeppenfeld's agent and Zeppenfeld in turn Sansone's agent for such purpose. The Randolph lease specifically obligated the lessee to provide either lien waivers or a performance bond prior to beginning construction. Having obligated itself to do so the fact that the lessor insisted upon performance of this covenant of the lease would not make the lessee the agent of the lessor for the purpose of obtaining the waivers.

If Campagna's fraud is not to be attributed to Sansone or Roads on the basis of agency, we are left to general principles for the determination of the effect of the waivers as to Roads and Sansone. "The principle is often stated, in broad and sweeping language, that fraud destroys the validity of everything into which it enters, and that it vitiates the most solemn contracts, documents, and even judgments." 23 Am. Jur., Fraud and Deceit, Sec. 19, p. 770. Obviously, as is so often the case, this broad generalization is not entirely correct. The same authority tells us: "Generally speaking, the right to avoid a contract induced

by fraud must be exercised before the rights of third parties have intervened." Id., p. 771. "Where a party is induced to enter into a transaction with another party that he was under no duty to enter into by means of the latter's fraud or material misrepresentation, the transaction is voidable as against the latter and all who stand in no better position (with certain qualifications and exceptions)." 2 Restatement of Contracts, Sec. 476(1), p. 908. "In some cases rights which cannot be avoided may arise in favor of innocent third persons who rely on the transaction. An assignee of an ordinary contractual right is subject to the same defenses as the assignor * * *, but a bona fide purchaser of a chattel or land or of a negotiable instrument before maturity is not. Such a purchaser may derive title from the fraudulent person, as is often the case where land, goods or negotiable instruments are obtained by fraud and transferred * * *." Id., comment e, p. 910.

There is a dearth of reported cases involving fraud in obtaining mechanic's lien waivers. The following rule is stated in 57 C.J.S. Mechanics' Liens § 246, page 821:

"Whether the owner will be allowed in equity to take advantage of a release fraudulently procured by the contractor from a claimant depends on the agency of the contractor, and the owner will not be allowed to take any benefit or advantage of the release where the contractor was the agent of the owner, and will be entitled to protection only to the extent that he has acted on the faith of the release where the contractor was the agent of claimant."

The St. Louis Court of Appeals, in Giammarino v. J. W. Caldewey Construction Company, 72 S.W.2d 159, followed the principle behind the rule above stated in a case involving a mechanic's lien waiver not supported by consideration. In that case a subcontract for plastering had been let to the lien claimant. After completion of the plastering work, the contractor gave the lien claimant a check for $250 in part payment for his work, in return for which the claimant executed a lien waiver. The check which the claimant received was not paid when presented to the bank. The owner, when the lien waiver was exhibited to him, made payment of $250 to the construction company in reliance upon the waiver. In passing upon the claim the court stated:

"Appellants insist here that the court below erred in adjudging respondent entitled to a mechanic's lien against their property because respondent waived his right to such lien by executing the lien waiver before mentioned. It is manifest, however, that such lien waiver was ineffective, for want of any consideration to support it, except in so far as the appellants in reliance upon such lien waiver, made payment to the construction company. 40 C.J. 314, 340. Since the court allowed appellants credit for the payment of $250 made by them to the construction company, they have no ground for complaint on account of such lien waiver."

See also Tuttle v. Harris, 83 N.J.Eq. 666, 92 A. 596.

■ The supporting principle for this rule is in effect one of estoppel. The party executing a lien waiver will not be heard to assert its invalidity as against an owner who has paid out money or otherwise changed his position to his detriment in reliance upon the waiver. Here there is no contention that Roads and Sansone expended any money in reliance upon the waivers executed by the claimants. However, they contend that they changed their position by foregoing the exercise of the right available to them to cancel the leases because of failure to comply with the terms requiring lien waivers and financing commitment before construction. In any event, however, Roads and Sansone did not forebear in such regard in reliance upon lien waivers or any other promises or representations to them by the claimants prior to the delivery of the waivers.

■ Prior to delivery of the waivers Sansone and Zeppenfeld knew that the construction was proceeding despite Randolph's

failure to comply with the terms of its lease from Roads and in turn Roads' failure to comply with the terms of the Sansone lease. In the case of Zeppenfeld, failure to insist upon compliance was in part attributable to his reliance upon Campagna's statements that some waivers had been obtained and all would eventually be furnished. The exact date of such conversation was not shown. It apparently took place at a time when Campagna actually had no waivers. Thus, Roads and Sansone did withhold the exercise of power to terminate the lease prior to the delivery of the lien waivers. Had no lien waivers been executed and delivered to them, their interest would, under our conclusion above stated regarding their liability to liens, have been subject to liens for work and materials furnished for the project. They should not be permitted to rely upon the fraudulent lien waivers in order to better their positions at the time of their delivery, but may only do so insofar as they did thereafter refrain from exercising their right of cancellation in reliance upon the waivers presented to them. We therefore conclude that Mid-West, Miller and Baker are entitled to liens for work done and materials furnished to and including July 29, 1958, but that the lien waivers preclude their claiming liens against the reversionary interest for labor and material thereafter furnished.

*Did the acceptance and recording of the lease assignment from Randolph preclude Mid-West's establishing a mechanic's lien?*

■ The trial court confirmed the finding of the referee that the conditional assignment was executed as security for payment to become due under the contract, with no intention on the part of Mid-West actually to become a tenant of the premises. Sansone and Roads here renew their contention that the acceptance of the assignment and subsequent recording of the lease preclude Mid-West's lien claim, basing their contention on the legal proposition that a "lessee may not derogate the landlord's title." In view of the citation of Eld v.

Ellis, Mo.Sup., 235 S.W.2d 273, 277(11), and Young v. Smith, 28 Mo. 65, the legal doctrine invoked is apparently the "well-established rule that a tenant in possession is estopped to deny his landlord's title." Eld v. Ellis, supra. That doctrine has no application here. For one thing, although Mid-West recorded the conditional assignment, it at no time entered upon actual possession of the premises. It declined to pay the rent and assumed no rights with respect to the property as a tenant. Inasmuch as in their brief Sansone and Roads deny that they were urging that the conditional assignment constituted payment of the Mid-West claim, we do not, therefore, consider the effect of the conditional assignment from that standpoint.

*Is Precon entitled to a lien for the entire amount of its claim?*

■ The trial court found that Precon was entitled to a lien for the full amount of its claim because no lien waiver was ever executed on its behalf. Roads and Sansone appeal from this finding, contending that the Mid-West waiver included also the claim of Precon.

Precon's claim is that it furnished Mid-West the precast concrete items which appeared in Mid-West's account. Bierman was president of both Mid-West and Precon. Both corporations maintained their offices at the same location. The lien waiver executed by Bierman on behalf of Mid-West was for "General Construction including pre-case concrete, etc." It was conceded that the word "pre-case" should have been "pre-cast." In our opinion, the obvious intention of Bierman was to release the precast materials furnished under Mid-West's contract. Not having at that time asserted any separate claim on behalf of Mid-West's affiliate, Precon, he should not subsequently be permitted to assert, on behalf of that company, that the waiver was not intended to include Precon's account. In this situation, Precon's lien claim can be on no better footing than that of Mid-West.

*Lien Claims of Joseph A. Campagna and Campagna Corporation.*

 Campagna and Campagna Corporation filed a cross bill, in which they asserted lien claims in the amount of $161,474.02. They alleged that they contracted with Randolph as original and general contractors for the construction of the bowling alley building. Their claim included the claims of the other lien claimants, plus additional amounts expended directly by Campagna or Campagna Corporation for labor on the project, "overhead, profit and insurance," architects' fees and other expenses.

The referee and trial court rejected the claim on the grounds that Campagna and Campagna Corporation were agents of Randolph and not contractors within the meaning of the mechanic's lien statutes. On this appeal, Campagna and Campagna Corporation contend that the conclusion that they were agents of Randolph bars their claims to liens was erroneous and that, in any event, they were not agents of Randolph, but were independent contractors.

According to Joseph Campagna, he undertook the construction of the bowling alley building pursuant to an agreement with Randolph's stockholders. He selected Mid-West as contractor for the shell of the building and subsequently designated Campagna Corporation to take over the remainder of the job "as general contractor, with certain contracts directly to the subcontractors." Campagna testified that his agreement with the Randolph stockholders was in writing. However, the only written agreement introduced in evidence was dated June 30, 1955. That agreement called for the construction of a building by Campagna at a cost of $1,100,000.00. The parties to the agreement were Randolph's shareholders, other than Campagna and Meyer, as parties of the first part, and Joseph A. Campagna, John J. Campagna and Meyer as parties of the second part. Randolph was also a party to the agreement. Although the agreement was concerned primarily with the obligation of the Randolph shareholders

and the Campagna interest in the financing of the proposed building, it does recite that the Randolph shareholders desired that Campagna be responsible for the construction of the building and Joseph A. Campagna agreed to "be responsible for the construction and delivery to Randolph Development Corporation of the office building herein described * * *." The bowling alley building was not the $1,100,000 building contemplated by the 1955 agreement. Whether the agreement was subsequently modified to make it applicable to the bowling alley building was not shown. In any event, there was no evidence that Campagna contracted with either Randolph or its shareholders to construct the bowling alley building for a specified price or on a cost-plus or other basis. Although Joseph Campagna testified that only Campagna Corporation contracted with its "subcontractors" Miller, Koeneman and Baker, the Miller contract introduced in evidence, which is in the form of a proposal to Campagna Corporation, was accepted by both Campagna Corporation and Randolph. The Baker contract also was executed by both Campagna Corporation and Randolph. Meyer's letter of July 29, transmitting the lien waivers to Sansone's attorney, is on the letterhead of the Campagna Corporation, although the capacity in which Meyer signed the letter is not shown. However, the letter does state that Mid-West is "the general contractor" and Meyer assured that the waivers would provide complete protection to "Mr. Sansone against the possibility of liens being placed against the property as a result of the construction of the bowling alley building." In view of the fact that Meyer was a party to the 1955 agreement from which Campagna apparently feels that he derived his authority to select Campagna Corporation as the general contractor for the project, Meyer's assurance would certainly have some significance relative to the status of Campagna and Campagna Corporation.

 We are of the opinion that Campagna and Campagna Corporation did not

show that they performed "any work * * * or furnish(ed) any material * * * for (a) building * * * under or by virtue of any contract with the owner or proprietor thereof * * *" within the meaning of Section 429.010, RSMo 1959, V.A.M.S. Therefore, the trial court properly denied their claims for liens.

### Is Mid-West entitled to a general judgment against Campagna and Campagna Corporation?

The trial court confirmed the referee's findings, conclusions and recommendations as to a general judgment in favor of Mid-West and against Campagna, Campagna Corporation and Randolph in the sum of $73,236.37. Here, Campagna and Campagna Corporation contend that the award of a general judgment against them is error. Campagna contends that he was not a party to the contract with Mid-West and that his personal execution of the contract document on July 23, 1958, was not as a contracting party but was merely an acknowledgment by him of certain amendments after Mid-West had substantially performed its obligation. He further contends that, if the intention was to obligate him as a party, there was no consideration for his undertaking. Campagna Corporation contends that Mid-West's evidence showed that it considered Randolph the party obligated to it and that, if Campagna Corporation was the original obligor, the agreement was subsequently revised to substitute Randolph as obligor.

The circumstances surrounding the execution of the contract with Mid-West have been set out above. Originally, the basic contract document was in the form of a proposal, dated April 21, 1958, by Mid-West, addressed to Campagna Corporation. As president of Campagna Corporation, Joseph Campagna signed the proposal, thereby indicating acceptance thereof, on April 29, 1958. The words "The Campagna Corporation" were written above a line below which was the printed word "Purchaser." Although the proposal form states: "When accepted in writing, this quotation shall con-

stitute a binding contract * * *," Mid-West, designated as "Contractor" did not execute its acceptance until July 23, 1958, having then been working on the project since around May 10. Numerous changes had been made in the plans as the project got under way and under date of July 8, Mid-West had submitted to Campagna a revision of the proposal, embodying changes which had been or were to be made and numerous alternates.

Little appears in the record as to the circumstances of the July 23 execution of the contract document. Bierman testified that Campagna and Randolph were added as addressees and signers of the proposal on the advice of his attorney. Bierman stated:

"Well, originally, I understood we were—our contract supposedly was with Randolph Development Corporation. When we finally came to signing the contracts and getting the proper names and who this contract was going to be with, we made it to all three: Joseph, personally; Randolph; and Campagna Corporation. But we didn't know where the interest lies, and we were, in my estimation, making a contract with all three, depending on just—that was the way the contract was signed. It was made out to them and signed that way."

Campagna merely identified his signatures to the document. He attempted no explanation of the circumstances surrounding his signing.

Apparently Campagna's contention that his signature was placed on the contract merely as an acknowledgment of changes is based primarily on the fact that the name "Randolph Development Corporation" is the only name appearing above the word "Purchaser" on the last page of the contract. The last sentence of the document prior to the typed Randolph name reads: "Adjusted prices, conditions, terms are hereby acknowledged." There is no reason to conclude that Campagna and the Campagna Corporation whose names also appear below the word "Purchaser" executed the instrument as of July 23 as an acknowledgment of adjusted prices, terms and conditions.

The signature of Randolph would have constituted a sufficient acknowledgment to that effect. Randolph, Campagna and Campagna Corporation had all been made addressees of the proposal. According to Bierman, their signatures were as obligors under the contract. There is nothing to refute such conclusion.

■■■ As for lack of consideration for Campagna's signature, no evidence was offered in that regard. The contract was in writing and thereby imported consideration. Section 431.020, RSMo 1959, V.A.M.S. If it was to be avoided on the grounds of want of consideration, some evidence to that effect was required and none is to be found.

■■■ As for Campagna's contention that Randolph was intended to be the sole obligor under the contract, Bierman did, as above quoted, state that his original understanding was that the contract was with Randolph. However, it is undisputed that the original proposal of Mid-West was addressed to Campagna Corporation, not to Randolph. It was accepted by Joseph Campagna on behalf of Campagna Corporation. All of Mid-West's invoices were directed to Campagna Corporation. Under the evidence, we find that Campagna Corporation was an obligor under the contract with Mid-West. The July 23rd changes did not substitute Randolph for Campagna Corporation as the obligor under the contract. There is no evidence to refute Bierman's explanation of what occurred at that time. The fact that the signature of Campagna Corporation appears below the word "Purchaser" on the final page of the contract is not sufficient to show that Campagna Corporation did not execute the contract as an obligor along with Randolph and Joseph Campagna.

We find no error in the general judgment awarded Mid-West against Campagna Corporation and Joseph Campagna.

### Against what portions of the entire lot are liens to be allowed?

As above set out, when the bowling alley project got under way, the original 300 ft. lot leased by Sansone was divided into two tracts, referred to as Parcel A and Parcel B. Parcel A on which the bowling alley was to be constructed fronted 185 feet on Clayton Road and extended northwardly a depth of 165 feet. The bowling alley building was to be 146' 10" x 145', the former measurement to be the width of the building fronting on Clayton Road and the latter the northward depth of the structure.

There was some uncertainty about setback requirements for the building and originally, Mattus, acting for Mid-West, started to stake out the site on the same line as the building on the adjoining lot to the west. However, Clayton building authorities finally told Maritz, Campagna's architect for the project, that the requirement was that the building be ten feet from the property line. Maritz went to the site and found Mattus preparing to stake out the building on the line of the adjacent structure. When told of the city requirement, Mattus located a point ten feet from the property line. This involved moving the building forward some seventeen feet. Maritz decided that such location looked too near the street so he suggested that the structure be moved back an additional two feet. On this basis, the location was staked out. Upon completion of the building, the north 7.42' of it were to the north of the north line of Parcel A and to that extent encroached upon Parcel B. Apparently the situation arose because of failure to take into consideration that in 1955 a 15 ft. strip off the south side of the tract had been quitclaimed to the City of Clayton for the widening of Clayton Road.

The lien waivers of Mid-West, Baker and Miller described only Parcel A. The referee found that since the waivers described only that tract, they were ineffective as to Parcel B. Originally the trial court agreed, but, in response to after-judgment motions, he amended his judgment, concluding that the parties intended that the bowling alley be located on Parcel A; that it was extended to Parcel B by mistake; that it "was not authorized by a written lease between

the defendant Roads * * * and the defendant Randolph * * * so that Randolph * * * was not the agent of Roads * * * for construction of such improvements on Parcel 'B'."

Division of the tract into two parcels was for the convenience of Randolph to assist in financing. After the division, the same parties had the same interests in the same tract of land. Randolph had the right to build on both tracts. Although it was undoubtedly contemplated that the bowling alley would be located entirely on Parcel A, no one on behalf of Roads appears to have made any effort to assure that the structure was confined to that tract. Its encroachment upon Parcel B was, insofar as the parties here involved are concerned, legally significant only insofar as it might have amounted to a failure to comply with the requirement of the lease of Parcel B that improvements thereon be constructed at a cost of not less than $600,000.00. However, Roads did not invoke that provision of the Parcel B lease, but forfeited both leases for nonpayment of rent, thereby restoring to itself the ownership of the leasehold interest in the entire tract, undivided.

■ The improvements having been constructed on both tracts of the divided premises, we are of the opinion that the liens should attach to the entire tract. The agency of Randolph for Roads extended to the entire tract. Roads, upon which the burden of objection rested, took no action. It should not now be heard to say after the work has been done, that, as to Parcel B, the work was beyond Randolph's authority, particularly in view of the fact that, upon cancellation of the lease, Roads accepted the benefits of the work done on both tracts.

■ As for Sansone, his lease was of the tract without division. Roads' agency for improvement extended to the entire tract. The bowling alley building by itself met the improvement covenant of Sansone's lease. He has no standing to assert that the

liens should apply to only a portion of the original tract.

■ Although the lien waivers described only Parcel A, we apply our conclusion that the waivers preclude claims of liens against the reversionary interests for labor and materials furnished after July 29, 1958 to both Parcel A and Parcel B. The mislocation of the building was, insofar as appears, unknown to any of the parties at the time of the execution of the waivers. By their waivers the contractors obviously intended to forego their lien rights on the entire project. The waivers were tendered to the owners of the reversionary interests on such basis. No one contemplated that the releases were partial only. Having been executed, tendered and accepted on the assumption that the waivers applied to the project as a whole, they should be given such effect.

*Conclusion*

The judgment of the trial court is reversed insofar as it disallowed the lien claims of Mid-West Engineering & Construction Co., Val Baker Company, Inc., and Phil L. Miller Plumbing & Heating Company, and the judgment is reversed insofar as it allowed the lien claim of Precon Concrete Products Company. The cause is remanded to the trial court for further proceedings with respect to such lien claims, consistent with this opinion. The remainder of the judgment of the trial court is affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

HYDE, P. J., and HOLMAN and HENLEY, JJ., concur.

DONNELLY, J., not participating because not a member of the Court when the cause was submitted.