Sheldon V. UTLEY, d/b/a Central States Electric Company, and R. E. Winegardner Plumbing & Heating Company, Inc., Plaintiffs-Respondents,

v.

William A. WEAR, Receiver in Bankruptcy of Guy Sprague, Defendant,

and

D. Bunch Sansone, Defendant-Appellant.

Nos. 7797, 7798.

Springfield Court of Appeals.

Missouri.

March 24, 1960.

788

Milton B. Kirby, Springfield, for defendant-appellant.

Meredith B. Turner, Stewart, Reid & Turner, Springfield, for respondent Utley.

Turner White, Arch M. Skelton, Chinn & White, Springfield, for respondent R. E. Winegardner Plumbing & Heating Co., Inc.

RUARK, Judge.

These mechanic's lien cases were, by agreement, consolidated in the lower court because they both involve work and materials, electrical and plumbing, furnished on the same project. Liens were adjudged in both instances, and Sansone, owner of the building, has appealed. The substantial facts are as follows:

Appellant Sansone was the owner of a two-story brick building in the downtown business section of Springfield. The age of the building is not shown, but evidently it is not new. For at least fifteen years the second floor had been partitioned into office spaces and had been used by a college of commerce and for offices. Thereafter it had remained vacant for the space of one year because the owner did not desire to let except to someone who would lease the whole floor. For some years prior to the occupancy for business offices it had been used for living quarters, and it had "utilities" appropriate for living quarters at that time and period. The second floor was, quite evidently, in some "state of disrepair." It had never at any time been equipped or used for a restaurant or cocktail bar. The evidence is such that we consider it could not have been so used without extensive alterations.

On January 22, 1958, owner Sansone leased this second floor to tenant Sprague. The lease was to commence March 10, 1958, but lessee was granted immediate right of possession in order to allow time to "renovate and repair." The term was for five years with option of renewal for an additional five years at an arbitrated rent. It was provided that "the parties hereto agree that *said lease is granted for the purpose of the Lessee operating a cocktail bar and dinner house.*" It was also provided that "Lessee agrees to do all redecoration, remodeling and painting necessary to the opening and operation of said premises and Lessor grants to the lessee the right to remove certain partitions * * *." As we interpret the lease and the circumstances surrounding its execution, four classes of repairs, renovation, and improvement are involved or contemplated by the transaction. We will attempt to separate them as follows:

*Class A:* The lease *required* the tenant to "renovate and repair" *by* repairing all plaster and woodwork, by redecorating, by finishing and replacing a portion of the floors. On this renovation lessee agreed to spend not less than $6,100, and such was expressly made a part of the consideration of the lease. This expenditure so required was "exclusive" of any sums spent on the heating and air-conditioning equipment. In regard to such renovation and redecoration lessee was required to exhibit to the owner paid bills showing such sums to have been spent "in the repair and renovation"; and lessee further agreed to protect and save the lessor harmless from all claims for

mechanic's or materialman's liens arising from such.

*Class B:* The lessee agreed (and therefore was required) to install and maintain a new entrance door near the northwest corner, together with a marquee or other suitable entrance appurtenance. We are unable to say from the record whether this was simply a renovation and redecoration of an old entrance or was substantially new construction, but it probably does not concern any of the items for which the lien is claimed in this case.

*Class C:* It was also stated that the tenant "shall renovate and repair * * * by installing * * * heating and air-conditioning equipment"; but it was in such lease thereafter specified that the tenant had the right to use the existing heating system "provided that he supplies furnace and boiler and if the Lessee shall so *elect* to use said heating equipment now in the said building and for such purpose shall install furnace and boiler, then said Lessee shall not be permitted to remove said furnace and boiler" at the end of the term. As to all *other* heating and air-conditioning equipment installed by lessee, it was provided that he could remove the same at the expiration of his term provided he restored "the present heating system," exclusive of the boiler, and provided further that where such removal resulted in any defacement or marring of the premises such should be restored and repainted. The contract also made specific provision that if the lessee "shall elect" to install his own heating system and should remove the steam radiators, he should store such radiators in the basement, properly cap all steam lines, and at the end of his term should restore all lines "as provided above herein." The cost of this installation was expressly excepted from and not included in the $6,100 which lessee was obligated to expend for repairs and renovation.

What we will refer to as *Class D* improvements is the installation of electrical and plumbing facilities necessary to the operation of a cocktail bar and kitchen. These things were not specifically mentioned at any place in the lease, yet it is clear that if the lessee was to operate a cocktail bar and dinner house, and if such facilities were not available as a part of the then building makeup, they would have to be made available by *someone.*

Under this arrangement Sprague made extensive alterations whereby the whole floor was transformed into dining and cocktail rooms, with orchestra stand, bar, and kitchen. It is stipulated that the lessee actually expended total funds slightly in excess of $6,000 "for repairs," but the particular items of paid expense are not listed. It is agreed that there remains a total unpaid balance of $3,713.

Utley, claimant in case No. 7797, supplied electrical work and material. He testified that he "very nearly" rewired the premises and also wired for special equipment. For "the most part" the wiring he installed is attached to the building and it would be "uneconomical" to remove it. Certain parts of the installation were necessary to the building regardless of its use. Other portions were necessary only to the peculiar functions such as air conditioning, and bar and kitchen equipment. He thought that about all but $150 was for air conditioning. Some of the work had been paid for and some had not. There is a balance due in amount of $400.

R. E. Winegardner Plumbing & Heating Company, Inc., plaintiff in case No. 7798, replaced much of the heating system, roughed in some new toilet facilities (the premises already had toilets and lavatories, some in bad condition), kitchen and connecting system and bar and connecting system. This included extending waste lines and water lines and "some fixtures." In revamping the heating system it removed the old iron radiators and installed new fin-tube radiation. Apparently the system was changed over from steam to hot water, but part of the old system was utilized in this process. The kitchen equipment in-

·cluded ·vents, grease traps, and garbage disposal. This last, claimant says, was necessary because the kitchen was in the southwest part of the building and the (only) entrance was in the northwest ·corner, which would have required the conveying of garbage through the dining room. It would not be practicable to remove most ·of the installations, because most of them were custom tailored to the job and the removal would require taking up part of the flooring. The total cost of this was $1,800. Some of the items had been paid for. The balance remaining is $1,179.41. *Apparently* (but we are in doubt about some items) no claim is made in this case for work on the heating system or for "bathroom work."

The memorandum findings of the trial court were in substance:

(1) Prior to the lease the premises were divided into partitions and offices and the total rental was $300 per month.

(2) Both parties found it desirable to ·convert the premises so as to be suitable for use as cocktail bar and cafe.

(3) Such conversion would be an extensive and expensive operation, and to secure its performance lessee was required to spend at least $6,100.

(4) That expenditure was a part of the consideration for the lease and the $225 monthly rental was $75 less than the total rent had previously been.

(5) Lessor was aware of the possibility ·of liens, and to protect himself he caused to be inserted a covenant to protect and save him harmless from such liability, but there was no security for the fulfillment of that covenant.

(6) The inescapable conclusion is that the lessor considered the proposed alteration of the building to be a substantial and permanent improvement; that he agreed to accept the expenditure of $6,100 as part of the rental for the term of the lease, and thereby he made a substantial contribution to the cost of the improvement.

(7) The lease did not obligate the lessor to pay $6,100 or any other sum toward the cost of remodeling, nor does it limit his liability to any sum.

(8) The over-all purpose of the lease was to remodel the building for a cocktail bar and cafe, and by necessary implication the remodeling was necessary to accomplish that purpose, which could not be accomplished without a kitchen. No bar or kitchen would be complete without plumbing and adequate lights.

(9) The labor and materials furnished an essential part of the improvement, which was a part of the lease contract.

(10) The lessee was obligated to do all redecorating, remodeling, and repainting necessary for the operation of his business, and the facts bring the case within the doctrine of implied agency. The lessee was agent of lessor, with no authority to make lessor personally liable but with authority limited to subjecting the reversionary estate to mechanic's liens.

It is and was the theory of respondents that all work and materials·went into substantial betterments to the freehold which were *required* to be made by the lease. Hence the tenant was agent for the owner in their procurement. Appellant's theory is the converse.

Under Section 429.010, every person who supplies labor or materials for a building under contract with the owner, *or his agent,* becomes entitled to a lien upon compliance with the prescribed procedure. The mechanic's lien law, being remedial, is construed liberally in favor of the lien. Weis & Jennett Marble Co. v. Rossi, 198 Mo.App. 35, 198 S.W. 424; Concrete Engineering Co. v. Grande Building Co., 230 Mo.App. 443, 86 S.W.2d 595, 607. For it has an equitable purpose and the aim is to accomplish substantial justice. Herrman v. Daffin, Mo.App., 302 S.W.2d 313.

The subjection of the premises to a lien for improvements made. by a tenant

cannot arise from the mere *relationship* of landlord and tenant. It must come from the fact (if such is the fact) that the tenant is the agent for the landlord.[1] This agency can, of course, be expressly granted by the contract. However, in the cases which have reached the appellate courts of Missouri the agency sufficient to incur the lien is often found to arise by implication. The question then in each case is whether the particular facts justify that implication.

It is frequently stated that the mere permission or *acquiescence* of the landlord for the tenant to have the work done is not (alone) a sufficient factual basis for implication of such agency.[2] But where the lease *requires or obligates* the tenant to construct improvements *which substantially enhance the value of the freehold,* then the tenant is usually considered as having been authorized as agent of the owner for the purpose of subjecting the premises to a lien. American Sash & Door Co. v. Stein, 231 Mo. App. 221, 96 S.W.2d 927; Ward v. Nolde, 259 Mo. 285, 168 S.W. 596; Dierks & Sons Lumber Co. v. Morris, 170 Mo.App. 212, 156 S.W. 75; Allen Estate Ass'n v. Fred Boeke & Son, 300 Mo. 575, 254 S.W. 858; Powell v. Reidinger, Mo.App., 234 S.W. 850, 852. One of the statements of the rule is made in Dierks & Sons Lumber Co. v. Morris, supra, 156 S.W. 75, loc. cit. 77:

"So that, in order to make such covenant constitute an agency between the lessor and lessee, we are necessarily bound to look at the facts to determine whether there was an agency or not. If, on account of the shortness of the lease, the extent, cost, and character of the improvements, or other facts in evidence, such as the participation by

the lessor in the erection or construction thereof, it can be seen that the improvement is really for the benefit of the lessor, and that he is having the work done through his lessee, then it can be said with justice that the lessee in such case is acting for the lessor. But if the facts do not show this it would seem to be untenable to say that the mere inclusion in a lease of a covenant to improve and repair on the part of the lessee will create the relation of agency between the tenant and the landlord, especially where the tenant is to do the work at his own expense, and is expressly denied any authority to bind the landlord."

In respect to whether the improvements *actually* enhance the value of the premises as events finally work out, it is a question of what the owner can be said to have intended at the time the premises were improved. That his judgment was bad, or that he was disappointed by later events, is of no moment. American Sash & Door Co. v. Stein, supra, 96 S.W.2d 927, 931; Masterson v. Roberts, 336 Mo. 158, 78 S.W.2d 856, 858, 97 A.L.R. 862.[3]

It would follow, however, that, since agency *is* a matter of contract and intention, it cannot be implied to a greater or more extensive improvement than that which the landlord required or contemplated. Ward v. Nolde, supra, 168 S.W. 596, 601; see Marty v. Hippodrome Amusement Co., 173 Mo.App. 707, 160 S.W. 26. But once the implied agency be found to exist, the landlord cannot divest himself of his liability by specifically providing that the tenant may not bind the owner as his agent for the expense of the improvement,[4]

1. Weis & Jennett Marble Co. v. Rossi, 198 Mo.App. 35, 198 S.W. 424; McGuinn v. Federated Mines & Milling Co., 160 Mo. App. 28, 141 S.W. 467; annotation, 79 A.L.R. 962; annotation, 163 A.L.R. 992; and cases *post.*

2. See Sol Abrahams & Son Const. Co. v. Osterholm, Mo.App., 136 S.W.2d 86, 92; Philip Carey Co. v. Kellerman Contracting Co., 185 Mo.App. 346, 170 S.W. 449; and cases *post.*

3. See also Weis & Jennett Marble Co. v. Rossi, 198 Mo.App. 35, 198 S.W. 424, 425.

4. Allen Estate Ass'n v. Fred Boeke & Son, 300 Mo. 575, 254 S.W. 858.

or that all the improvements shall be made at the expense of the tenant.[5]

In determining whether an agency should be implied the courts have often, perhaps of necessity, gone beyond the agreement and into the whole circumstances of the letting in order to find the answer. And in at least two cases it has been held that where the premises are let for a *specific purpose* and where the nature of the premises is such that the purpose *cannot be accomplished* except by the making of substantial improvements to the freehold, then the tenant is, by implication, *required* to make such improvements. He has no other option, and hence he is the landlord's (implied) agent to the extent of subjecting the property to a lien, this upon the theory that the landlord contemplated the necessity and required that such necessity be met. Dougherty-Moss Lumber Co. v. Churchill, 114 Mo.App. 578, 90 S.W. 405; Curtin-Clark Hardware Co. v. Churchill, 126 Mo.App. 462, 104 S.W. 476; see also Masterson v. Roberts, supra, 78 S.W.2d 856.[6]

■ As to Class A improvements (certain repairs, redecoration, and renovation): These were not only necessary to the operation of the business called for in the lease, but the lease itself *required* such up to (at least) $6,100 worth, and the doing of such was made a part of the consideration of the lease. The owner evidently considered the redecoration and finishing of floors, et cetera, of substantial benefit to the premises as a whole, and so do we; and if changes or replacements in the plumbing or wiring were involved or became reasonably necessary in doing this, such were a part of the work required of the tenant. Under the holdings there can be no question that the tenant was the implied (limited) agent of

the owner in procuring the labor and materials necessary to accomplish this object. It is possible, although not likely, that these items, when added to the total sum already expended for these repairs and renovations, will call for a total in excess of the required $6,100. The agency is not necessarily limited to repairs and redecorations which require a total expenditure of $6,100 and no more. The requirement was to do certain specified things, and it was expected that such would cost at least $6,100. If the doing of the things required called for the expenditure of an additional sum, such was still required; but the implication of agency would extend only to those excess items which were reasonably appropriate and necessary to the renovation, repair, and redecoration which was contemplated by the parties. It would not extend to some excess extravagance of the tenant beyond the fulfillment of such contemplated plan. Further mention of this will be made in reference to Class D improvements. From this record we cannot say with certainty whether an excess (over $6,100) was involved, nor, if so, whether any of the work done concerns construction or additions which were in extravagant excess of the contemplated purpose of the parties.

■ As to Class B (the entrance): This was specifically required by the lease in addition to the other repairs and renovation heretofore mentioned. Hence the tenant was the implied agent of the owner to subject the premises to a lien therefor. Whether any of the work for which liens are claimed was involved in this improvement we cannot say.

■ As to Class C (heating and air conditioning), the contract, when read as a whole, did not *require* the tenant to install

---

5. Dougherty-Moss Lumber Co. v. Churchill, 114 Mo.App. 578, 90 S.W. 405.

6. Although the implication *from the facts* in these cases seems difficult to adjust to those drawn in Marty v. Hippodrome Amusement Co., 173 Mo.App. 707, 160 S.W. 26, and Dierks & Sons Lumber Co.

v. Morris, 170 Mo.App. 212, 156 S.W. 75; see also Powell v. Reidinger, Mo. App., 234 S.W. 850; Martin-Welch Hardware & Plumbing Co. v. Moor, Mo.App., 16 S.W.2d 667; Mundet Cork Corporation v. Three Flowers Ice Cream Co., Mo.App., 146 S.W.2d 678.

heating and air conditioning except for furnace and boiler, and it was not then contemplated that such systems, if so installed, should constitute and remain permanent parts of the building. The tenant was expressly given the right to remove the same, and the lease contained directions for restoration upon such removal. Even "all lines" were to be restored at the end of the tenancy. True, the tenant was authorized to make use of it or parts of it, but it cannot reasonably be said that it was intended to be of permanent benefit to the freehold. We think it would be stretching "implication" beyond the breaking point to imply an agency to incur indebtedness for the furnishing of plumbing or wiring for any part of such heating and air-conditioning installations except the furnace and boiler.

■ As to Class D (kitchen and bar), this type of work contemplated new construction and installations which did not then exist. It was the addition of something entirely new, not a renovation or repair. It was not contemplated that such installation was to be a part of the Class A improvements. As a matter of fact, according to the argument of the appellant, it was not contemplated by the owner at all.

But (in ascending scale) the lessee was required to operate a cocktail bar and dinner house if he fulfilled the agreed purpose of the lease. Quite obviously a cocktail bar and dinner house cannot be operated without a bar, where, as we are informed, at the demand of the patron various mysterious offenses are committed against supposedly honest potables, and a kitchen for the preparation of the viands ordered by the guests. Hence the operation of this institution in compliance with the lease *required* that a bar and kitchen be installed. These installations *required* the support of electrical wiring and plumbing facilites, for they were reasonably necessary to the successful operation of the bar and kitchen. Under these circumstances it would seem that our decision should conform to the precedent established by the Dougherty-

Moss and Curtin-Clark cases (supra), and our holding is that the tenant was impliedly authorized as agent of the owner to contract to the extent of subjecting the premises for electrical and plumbing work reasonably necessary for the installation of a kitchen and bar in so far as the labor and materials therein expended went into that which became a permanent part of the building, as distinguished from readily detachable fixtures and appliances.

We recognize that the rule of implication in cases such as this is largely an improvisation of the courts in order to prevent inequity upon occasions when and where the owner, through the (perhaps calculated) means of a lease indirectly requires enhancement of his freehold at the expense of someone else. But it can become a harsh rule when applied simply because the tenant is restricted to a particular business, and it must have some common sense limitation. The implication should be made only to the extent of (and not beyond) those items and improvements which are reasonably required and necessary to fulfill the contemplated purposes of the parties. See Ward v. Nolde, supra, 168 S.W. 596. As applied to this case, the tenant was not "impliedly" given *carte blanche* to install platinum coated waste lines, if there are such things.

■ Some argument has been made in respect to the installation of vents and a garbage disposal. The vents we assume were to carry off cooking odors, and the garbage disposal is justified on the theory that there was no entrance except at the front, and the manual disposal of garbage would require its being carried through the dining room. Referring again to the requirement of the lease, this was to be a "cocktail bar and dinner house" in downtown Springfield. Perhaps the mingled scents from the kitchen and the cartage of garbage through the lunch room (or the tossing of the slops out the back window) might reasonably be contemplated for a "Guy's Roadside Beer and Chili Joint," in some area which is more or less uninhibited

and more or less free from regulation or supervision, but we doubt that such procedure would be compatible with a "cocktail bar and dinner house," where (we understand by hearsay) people gather to pursue a certain form of "culture" not associated with the smells of hot grease and French-fried onions or the sight of buckets of spent and sodden coffee grounds mixed with pale potato peelings threading their way between and among the tables. We believe the vents and the garbage disposal were reasonably necessary.

By the foregoing we have attempted to express what portions of, and to what extent, the work and materials supplied by the claimants were the subject of a lien against the premises of the appellant. It is obvious that a goodly portion falls within that classification and it is possible that some portions do not. The evidence is not sufficient for us to make this judgment. Since the circuit court apparently adjudged a lien for all installations claimed, without regard to the class into which they fall, we think the case should be remanded for the taking of more evidence (unless the parties can agree) in order to establish which of the items make the premises subject to a lien. It is the plaintiffs' burden to establish this.

Appellant has raised two other contentions, one that the plaintiffs were in reality subcontractors and therefore the statutory notice was not given in time; and the other that the application of the liens deprives the owner of his property without due process. We think both these contentions are disposed of by the holding (as to certain items) that the tenant was the agent of the owner with implied authority to secure the improvements. A further discussion or review of the authorities is unnecessary.

The case is remanded with directions to proceed in manner consistent with the views herein expressed.

STONE, P. J., and McDOWELL, J., concur.