MESSINA BROTHERS CONSTRUC-
TION COMPANY, et al.,
Plaintiffs-Respondents,

v.

Price B. WILLIFORD, et al.,
Defendants-Appellants.

No. WD 32210.

Missouri Court of Appeals,
Western District.

Jan. 26, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 2, 1982.

Application to Transfer Denied
April 13, 1982.

Robert J. Harrop & Don F. Dagenais of Gage & Tucker, Kansas City, for appellants, Williford, Sleyster and Mart Bldg. Co.

Roger J. Barbieri and Edward Heller, Kansas City, for respondent, Lexington Plumbing & Heating Co. Inc.

June Clark and David A. Welte, Kansas City, for respondent, Messina Brothers Const. Co.

Ronald E. Partee, Kansas City, for respondent Mor-Ford Drywall, Inc.

Patrick E. White, Kansas City, for respondent, R. F. Fisher Elec. Co., Inc.

Before MANFORD, P. J., and DIXON and NUGENT, JJ.

PER CURIAM.

This is an equitable mechanic's lien action. The trial court entered judgment in favor of lien claimants. Affirmed in part and reversed in part.

█ Review of this court tried matter is within Rule 73.01 and *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The rule that judgments of the trial court are to be affirmed unless there is no substantial evidence to support them, unless they are against the weight of the evidence or unless they erroneously declare or apply the law is equally applicable to actions upon mechanic's liens. *S & R Builders & Suppliers, Inc. v. Marler*, 610 S.W.2d 690, 692 (Mo.App. 1980).

In summary, appellants present three points which allege the trial court erred because (1) it misapplied or misinterpreted the law of agency as applicable to the mechanic's lien statute; (2) the court's find-ings of agency are insufficient to support its conclusions of agency and (3) the evidence is insufficient to support a finding of agency. There being a challenge to the sufficiency of the evidence, it is detailed along with the identity and relationship of the parties.

In 1955, appellants Williford[1] and Sleyster, along with two others, purchased the real property to which the trial court attached the liens. In 1960–61, the owners leased the property to Mart Building Co. (Mart), a company owned by Williford, Sleyster, and others for a term of 35 years. Mart constructed a 132,000 square foot building on the property and sublet it to Homeowners Mart for a period of 15 years. The Homeowners' lease was assigned to a series of successive tenants, the last of which was Community Discount, a division of Tractor Supply, Inc. (T.S.I.). During these successive lease assignments, the building was used as a discount store. The final tenant (T.S.I.) ceased operations and vacated the premises in mid-1973. The lease obligation, however, continued and T.S.I. continued to pay $8,000.00 per month. In the early 1970's, Williford and Sleyster became sole owners of the property and sole shareholders of Mart. The property, being vacant for a two-year (1973–75) period, deteriorated and fell into disrepair. These conditions included several broken plate glass windows, a malfunctioning air-condition compressor, and a broken and leaky boiler, plumbing and sprinkler systems.

Sometime prior to August 1, 1975, representatives of American Mini Malls, Inc. (A.M.I.) contacted Williford and Sleyster concerning the subleasing of the property from Mart. A.M.I. was referred to T.S.I. by Williford because of the lease obligation of T.S.I. to Mart. The record does not disclose the details, but A.M.I. and T.S.I. obviously completed negotiations whereby T.S.I. agreed to pay Mart the sum of $200,000.00 for immediate termination of the lease.

---

1. Pending this appeal, Williford died and by order of this court, his successors were designated parties herein.

On August 1, 1975, Williford, on behalf of Mart, entered into a lease with A.M.I. The initial terms of the lease were for 15 months until October 31, 1976, and provided A.M.I. ten successive one-year options. The lease allowed use of the premises "for any lawful purpose" and permitted the subtenant (A.M.I.) to make improvements at its "sole cost and expense." Rental was $8,000.00 per month. The lease also acknowledged that A.M.I. would expend substantial sums to improve the premises for its use and provided "accordingly no rental payments (other than the payments hereinafter expressly provided) shall be due from the lessee from the commencement of the term to December 31, 1976."[2] The lease further provided that Mart would advance the sum of $20,000 to A.M.I. to further defray the cost of lessee's improvements. This "advancement" was the result of A.M.I.'s attempts to borrow $20,000 from a local bank, and the loan was approved only with Williford's co-signature. A.M.I. defaulted on the bank note and Williford paid the balance of $16,000.00. Williford testified that the rental abatement plus the $20,000 "advancement" were designed to compensate A.M.I. for undertaking the obligation of T.S.I. to restore the premises and to provide A.M.I. a benefit of the lump sum payment ($200,000.00) by T.S.I. in discharge of its lease obligation.[3]

At the time of possession, A.M.I. intended to open a "flea market" operation on the premises. In this operation, merchandise would be sold by individuals from separate booths within the building. These booths or cubicles would be rented by A.M.I. to individual subtenants who in turn would operate their own retail businesses. The subtenants would lease the bare walls and would bear responsibility for the construction of shop fronts and other features. A.M.I. bore responsibility for erecting the partitions constituting the booths or cubicles.

In furtherance of its purpose, A.M.I. contracted with Messina Bros. Construction Co. (Messina) for the necessary work. This work initially was limited to the building of an indoor miniature golf course toward which Messina received payment of $40,000.00. At the insistence of A.M.I., Messina was hired to install a sidewalk cafe, pizza stand, juice stands and arcades, employee lockers, and a "host of minor projects." In order to complete the work, Messina engaged several subcontractors. At trial, Messina testified to the quality of the work by its subcontractors, the reasonableness of their charges and admitted its indebtedness to them.

Messina's total charges were $135,899.57, against which A.M.I. paid $75,000.00. Messina submitted a claim for a balance of $65,324.59 and after A.M.I. objected that this sum also included work done by Messina directly for some of the tenants of A.M.I., Messina submitted a revised balance of $60,899.57. When no payments were made by A.M.I., Messina and its subcontractors filed their mechanic's liens. These claimed liens were: Messina—$60,899.57, Mor-Ford Drywall Co. (Mor-Ford)—$6,083.61, North Kansas City Painting Co. (N.K.C.)—$9,663.68, E. J. Cody Co. (Cody)—$19,974.00 and Lexington Plumbing & Heating Co. (Lexington)—$20,593.65.

On March 25, 1976, Messina commenced this action against A.M.I., Williford, Sleyster, Mart and all of its subcontractors. Other parties were named as owners and parties defendant with the owners Williford and Sleyster. The record reveals they were not proper parties and the original judgment and this appeal do not include them. In addition, Royal Asphalt Co. (Royal) became a party upon the filing of its answer and cross-claim during trial by stipulation.

2. At trial, Williford testified that the abatement date (December 31, 1976) in the lease was in error and he had originally intended abatement to continue only to January 1, 1976.

3. The lease provided that A.M.I., upon termination of the lease, could remove (provided removal was within 60 days) all "materials, equipment and property of any kind installed or belonging to lessee". Lessee bore no responsibility of warranty as to the condition of the premises on surrender.

Forbes Construction Co. (Forbes) was named as a party by Royal. Forbes defaulted. R. F. Fisher Electric Co. (Fisher) filed its motion to intervene as a party plaintiff and sought enforcement of its lien claims against Messina, Williford and Sleyster. A.M.I. had ceased business. Messina sought enforcement of its claims as liens against the real property. The various subcontractors filed counterclaims against Messina and filed cross-claims against Williford, Sleyster, Mart and A.M.I. In their pleadings, the subcontractors sought enforcement of their claims as liens on the real property. Fisher sought to have its claim enforced as a lien on the real property.

No rent was ever paid by A.M.I., nor did A.M.I. ever exercise its renewal option under the lease. Following the termination of occupancy of the building by A.M.I., the building remained vacant for approximately two years. At this later date, the building was leased to its current tenant, the John F. Lawhon Furniture Co. In order to effect the lease with Lawhon, removal of the miniature golf course, partitions, arcades, food facilities and other additions made by A.M.I. had to be completed. These items were carried from the property to a dump location for disposal. As a result, none of respondents' work remained on the premises.[4]

Following trial of the issues, the court entered judgment in favor of Messina and against A.M.I. in the sum of $60,899.57, plus interest in the sum of $17,049.00 and ordered said judgment as a lien against the real property. In addition, the court entered judgment regarding the remaining parties as follows:

(1) Lexington against Messina in the sum of $20,593.65, plus interest in the sum of $5,766.21, said judgment to be a lien against the real property. Provided the judgment for Lexington is contained within the judgment and the lien awarded Messina, and if the judgment and lien of Lexington is satisfied prior to satisfaction of the Messina judgment, the judgment in favor of Messina will be reduced by the amount of the judgment in favor of Lexington. At such time as the mechanic's lien of Messina is satisfied in full, the lien of Lexington shall be automatically released.

(2) Cody against Messina in the sum of $19,974.00, plus interest in the sum of $5,592.72, said judgment to be a lien against the real property. The same proviso as in (1) above made applicable to Cody.

(3) N.K.C. against Messina in the sum of $9,663.68, plus interest in the sum of $2,705.83, said judgment to be a lien against the real property. The same proviso as in (1) above made applicable to N.K.C.

(4) Mor-Ford against A.M.I. in the sum of $15,466.97, plus interest in the sum of $4,330.75, said judgment to be a lien against the real property. Mor-Ford against Messina in the sum of $6,083.60, plus interest in the sum of $1,703.41, said judgment against Messina not to be a lien against the real property.

(5) Fisher against A.M.I. in the sum of $26,448.13, plus interest in the sum of $7,405.48, said judgment to be a lien against the real property. Fisher against Messina in the sum of $4,481.60, plus interest in the sum of $1,254.85, said judgment not to be a lien against the real property.

(6) Royal against Forbes in the sum of $7,380.57, plus interest in the sum of $2,066.54, said judgment not to be a lien against the real property.

This appeal followed. Royal and Forbes are not parties to this appeal. Before considering the issues of this appeal, disposition of a portion of the trial court's judgment is made herein. That portion of the court's judgment in favor of Royal against Forbes

---

4. One possible exception to this was some improvements provided by Lexington on plumbing and drainage systems in the sum of $9,000.00. The record, however, fails to disclose the exact location and nature of this work. The record further reveals that Lexington, by its evidence, elected to stand on its claim for a total of $20,593.65, which included this work.

is affirmed upon default by Forbes in the sum of $7,380.57, plus interest in the sum of $2,066.54. In addition, that portion of the court's judgment denying Royal a lien against the real property is affirmed as there is substantial evidence showing that the lien of Royal was untimely filed and failed to meet the requirements of Chapter 429, RSMo 1969. That portion of the trial court's judgment in favor of Mor-Ford against Messina in the sum of $6,083.60, plus interest in the sum of $1,703.41 is affirmed as there is substantial evidence to support that portion of the judgment. That portion of the trial court's judgment in favor of Fisher against Messina in the sum of $4,481.60, plus interest in the sum of $1,254.85 is affirmed as there is substantial evidence to support that portion of the judgment.

With the foregoing disposition of a portion or portions of the judgment, the main issues on this appeal are not only brought into focus, but this court can direct its attention to direct disposition of them without additional reference to other parties and matters within the court's judgment.

From the record, it is evident that this action was initiated, tried and judgment was entered upon the theory and conclusion that A.M.I. was the agent of Williford and Sleyster within the meaning of our mechanic's lien law, § 429.010 et seq., RSMo 1969, the relevant portion thereof which reads:

"429.010. Mechanics and others have lien on building and land, when.—Every mechanic or other person, who shall do or perform any work or labor upon, or furnish any material, fixtures, engine, boiler or machinery for any building, erection or improvements upon land, or for repairing the same, under or by virtue of any contract with the owner or proprietor thereof, or his agent, trustee, contractor or subcontractor, upon complying with the provisions of sections 429.010 to 429.340, shall have for his work or labor done, or materials, fixtures, engine, boiler or machinery furnished, a lien upon such building, erection or improvements, and upon the land belonging to such owner or proprietor on which the same are situated . . ."

In its findings of fact, the trial court declared, "The evidence is persuasive that A.M.I. became the 'agent' of Williford and Sleyster and the corporation for purposes of exerting mechanic's liens . . ." The court referenced the following evidence in support of its findings of agency. Williford had inspected the premises in the presence of representatives of A.M.I. Williford knew of the intended use of the premises as a flea market. Williford knew that extensive repairs were necessary and this knowledge was manifested in the lease. The rent was abated for a 15-month period and A.M.I. received a loan of $20,000.00 from Williford. The trial court found evidence to the contrary to be not credible. That evidence included Williford's testimony that he was shown brochures and slides of A.M.I.'s intended operation after the lease was signed; that Williford never entered the premises during the construction period although his office was only a mile from the premises and he drove past the premises between 50–100 times during the last five months of 1975. The trial court concluded that it was not so naive as to accept the suggestion that an experienced businessman would enter into a lease with an abatement of $136,000.00 in rent and make a loan of $20,000.00 without more than just "general knowledge" of how the money was going to be expended or the property improved. The court also found that the improvements outlasted the tenancy of A.M.I.

In its conclusions of law, the trial court declared A.M.I. the agent of Williford, Sleyster, and Mart within the meaning of § 429.010; that Williford was acting within the scope of his authority in the execution of the lease and acquired substantial knowledge of the nature of the work that would be undertaken to rennovate and repair the premises for use by A.M.I.

Appellants challenge the trial court's findings, conclusions and judgment by charging that the trial court erred because (1) it misapplied or misinterpreted the law of agency as applicable within the mechan-

ic's lien statute; (2) the court's findings of agency are insufficient to support its conclusion of agency; and (3) the evidence is insufficient to support a finding of agency. In addition to these alleged errors, appellants argue that (a) the lessors' (owners') consent to alterations by the lessee is insufficient to establish an agency; (b) there must be some intent by the lessors (owners) at the time of the execution of the lease to bind or obligate the lessee to make alterations which amount to a permanent and substantial benefit to the leasehold and (c) a finding of agency cannot be supported upon the mere acknowledgment by the lessors (owners) in the lease that the lessee would expend sums to remodel the premises.

Conversely, respondents argue that A.M.I. was the implied agent of Williford, Sleyster and Mart and such agency is based upon two policy considerations: (a) the mechanic's lien law is remedial in nature and should be liberally construed in favor of mechanics and materialmen and (b) knowledge of improvements by the landowner is equivalent to implied consent. Respondents further contend that since implied agency is to be determined by all surrounding circumstances, the lessors (owners) need not expressly require improvements by the lessee for liability under the mechanic's lien law to accrue to the real property.

From the record, it is evident that if any agency did, in fact, exist, it arose by implication. There is no evidence upon the record to support any finding of an express agency. Each of the lien claimants testified that their contractual dealings were either exclusively with the representatives of A.M.I. or each other. They had no contact with Williford, Sleyster or Mart. In addition, there was no evidence of any involvement by the owners in the nature, design, construction or progress of the work on the improvements.

█ It has long been recognized in Missouri that the mere existence of a landlord/tenant relationship does not support a finding of agency between them within the meaning of the mechanic's lien statute.

*Masterson v. Roberts,* 336 Mo. 158, 78 S.W.2d 856, 97 A.L.R. 862 (1934) and *Paul A. Medley, Inc. v. Money Town, Inc.,* 581 S.W.2d 46 (Mo.App.1979). The consent by the lessor to the making of improvements or alterations upon the leasehold is insufficient to create an agency within the meaning of the mechanic's lien statute. *Ward v. Nolde,* 259 Mo. 285, 168 S.W. 596, 600 (1914); *Sol Abrahams and Son Construction Company v. Osterholm,* 136 S.W.2d 86, 92 (Mo.App.1940); and *McGuinn v. Federated Mines and Milling Co.,* 160 Mo.App. 28, 141 S.W. 467, 468 (1911). In contrast, if a lease contains a provision requiring the lessee to make improvements of a substantial and permanent nature, the lessee, as a matter of law, becomes the agent of the lessor within the meaning of the mechanic's lien law. *Mid-West Engineering and Construction Co. v. Campagna,* 397 S.W.2d 616, 625 (Mo. 1965). This court, in *Medley* at 49 stated:

"For an agency to exist that would allow the tenant to encumber the interest of the landlord in the property, a right 'must spring from [the] contract, express or implied, between the tenant and the landlord.' (citations omitted) There must be some intent on the part of the landlord at the time of the signing of the lease to *bind* or *obligate* the tenant to make alterations *which will amount to a permanent and substantial benefit to the leasehold.*" (emphasis added)

In support of their argument, respondents rely upon authority which sustains a finding of implied agency where "... the premises are let for a specific use and purpose and the purpose cannot be accomplished except by the making of the improvements." *Branick Const. Co., Inc. v. Taylor,* 585 S.W.2d 282, 284 (Mo.App.1979). In *Utley v. Wear,* 333 S.W.2d 787, 793 (Mo. App.1960), it was declared:

"In determining whether an agency should be implied the courts have often, perhaps of necessity, gone beyond the agreement and into the whole circumstances of the letting in order to find the answer. And in at least two cases it has been held that where the premises are let

for a *specific purpose* and where the nature of the premises is such that the purpose *cannot be accomplished* except by the making of *substantial improvements to the freehold*, then the tenant is, by implication, *required* to make such improvements. He has no other option, and hence he is the landlord's (implied) agent to the extent of subjecting the property to a lien, this upon the *theory that the landlord contemplated the necessity and required that such necessity be met.*" (emphasis added)

 *Utley* notwithstanding, it has been recognized that in determining if the requisites of implied agency exist, the intent of the parties should, if possible, be gathered from the lease instrument. *Newport v. Hedges*, 358 S.W.2d 441, 445 (Mo.App.1962). Further, in *Medley* at 49, it was recognized that *the lease agreement can be of great importance in determining whether the lessee was obligated to make improvements which benefitted the lessor's interest.* The court in *Medley* declared:

"The alterations itemized in the lease were relatively minor in relation to the size of the building and would not have substantially altered the character of the building or its value to the lessor. The combined effect of the permissive language and the minor nature of the alterations specified in the lease demonstrate that the lessor's intent at the time of the signing of the lease was to do no more than to *consent* to minor alterations for the convenience of the tenant."

Respondents contend that specific provisions of the lease support the finding of implied agency. These particular provisions read as follows:

"3. RENT. The parties acknowledge that Lessee will expend substantial sums to improve the Premises to put them in the condition necessary for Lessee's use. Accordingly, no rental payments (other than the payments hereinafter expressly provided) shall be due from Lessee from the commencement of the term to December 31, 1976. If this Lease is then in effect, commencing January 1, 1977, the

rental shall be Eight Thousand Dollars ($8,000.00) per month, payable in advance on the first day of each month, commencing January 1, 1977, and continuing monthly thereafter during the term of this Lease and any renewals . . ."
and further,

"4. CONDITION OF PREMISES AND IMPROVEMENTS BY LESSEE.
* * * To defray a portion of the cost of such improvements, Lessor has, upon the execution of this Lease, advanced to Lessee Twenty Thousand Dollars ($20,-000.00), the receipt of which Lessee hereby acknowledges. Lessee agrees to reimburse Lessor for such advance by payments in ten (10) monthly installments of Two Thousand Dollars ($2,000.00) each, commencing November 1, 1975."

The foregoing are excerpts from the lease offered in support of respondents' argument. The full text of those provisions reads as follows:

"3. RENT. The parties acknowledge that Lessee will expend substantial sums to improve the Premises to put them in the condition necessary for Lessee's use. Accordingly, no rental payments (other than the payments hereinafter expressly provided) shall be due from Lessee from the commencement of the term to December 31, 1976. If this Lease is then in effect, commencing January 1, 1977, the rental shall be Eight Thousand Dollars ($8,000.00) per month, payable in advance on the first day of each month, commencing January 1, 1977, and continuing monthly thereafter during the term of this Lease and any renewals. All rental payments shall be payable at such place as Lessor designates. All taxes, costs, utilities, expenses and reimbursement of the advance as provided in Paragraph 4, which the Lessee is required to pay under this Lease shall be deemed additional rent and, in the event of nonpayment, Lessor shall have all the rights and remedies with respect thereto as Lessor has for the nonpayment of the basic rent.
4. CONDITION OF PREMISES AND IMPROVEMENTS BY LESSEE.

Lessee agrees to accept the Premises in their present 'as is' condition, and Lessor makes no warranties with respect to the condition of the Premises. Lessee agrees that any improvements to the Premises which may be required or desirable for Lessee's use of the Premises shall be done by Lessee, shall be the responsibility of Lessee, and shall be at Lessee's sole cost and expense. To defray a portion of the cost of such improvements, Lessor has, upon the execution of this Lease, advanced to Lessee Twenty Thousand Dollars ($20,000.00), the receipt of which Lessee hereby acknowledges. Lessee agrees to reimburse Lessor for such advance by payments in ten (10) monthly installments of Two Thousand Dollars ($2,000.00) each, commencing November 1, 1975."

It becomes evident from the reading of the foregoing provisions that they contain no requirement of A.M.I. to make improvements. It becomes equally evident that the foregoing provisions serve as an indirect financing assistance to A.M.I. In *Sol Abrahams*, the court held that where the contractor showed the lessor consented to the lessee's alterations in accordance with the lease but the lease provided that no alterations could be made without the lessor's written consent, the lessee was not the agent of the lessor. Further, it has long been recognized in our state that financial assistance in lessor-lessee relationships does not give rise to an agency within the meaning of the mechanic's lien statute. *Philip Carey Co. v. Kellerman Contracting Co.*, 185 Mo.App. 346, 170 S.W. 449 (1914).

Further examination of the lease herein supports a finding of no agency. The lease, in addition to the provisions above, contains the following:

"5. USE OF THE PREMISES. Lessee may use and occupy the Premises for any lawful purpose. Lessee shall not use or knowingly permit any part of the Premises to be used for any unlawful purpose."

"9. MAINTENANCE. Lessee shall, throughout the term of this Lease, at Lessee's sole expense, maintain the Premises in such condition as Lessee shall deem sufficient in Lessee's sole discretion, including repairs, renewals and replacements to the interior and exterior, structural and non-structural. Nothing contained in this Lease shall impose on Lessor the obligation to make any repairs or expend any moneys for the maintenance of the Premises."

"12. ALTERATIONS. Lessee shall have the right at any time and from time to time during the term of this Lease to make, at its sole cost and expense, such changes and alterations in or to the Premises as Lessee shall desire in its sole discretion."

From a reading of the lease instrument, it cannot be concluded that the parties intended A.M.I. to become the agent of the owners within the meaning of the mechanic's lien law as prescribed in *Newport* and *Medley*. Thus, if such agency did arise, it must be shown from the remainder of the circumstances beyond the lease instrument.

Respondents principally rely upon *Utley* for the principle that the lessor need not *explicitly require* improvements by the lessee as a condition to support a finding of agency. While as a general declaration of law the same is sound, it must, as all legal principles must, be considered in its relationship to the particular facts and circumstances of any given case. *Utley* does not control herein because it is distinguishable for two reasons. In *Utley*, the premises were let for a specific purpose, to wit, a cocktail bar and dinner house as contrasted with the instant case, wherein the only requirement as to purpose is that the lessee use the premises for a lawful purpose (see paragraph 5 above). Secondly, in *Utley*, the landlord was held liable upon a finding that the lease *required* a minimum expenditure by the lessee in addition to specific improvements, coupled with a further finding that the owner "considered the redecoration and finishing of floors, et cetera, of substantial benefit to the premises as a whole, . . ." *Utley* at 793. This is to be contrasted with the improvements and the

evidence herein concerning the owners' view of the improvements.

The evidence herein shows that the improvements consisted of interior partitions, an indoor miniature golf course, concession stands, restaurants and arcades. These items were of little or no value beyond the contemplated use by A.M.I. There is nothing within the testimony of the witnesses which discloses or which would support the conclusion that the owners viewed such improvements to be "of substantial benefit to the premises as a whole . . ." Reference to the lease instrument further dispels such contention because the lessors (owners) did not, under the terms of the lease, possess a reversionary interest in the improvements and became owners upon A.M.I.'s failure to remove the improvements within 60 days subsequent to the termination of the lease. Paragraph 21 of the lease spells this out in detail and reads as follows:

"21. SURRENDER OF THE PREMISES. Upon the termination of this Lease, Lessee shall surrender the Premises in the condition as it then exists. Lessee shall have no responsibility for and makes no warranties as to the condition of the Premises when they are surrendered. Lessee may at any time prior to or upon termination of this Lease, remove from the Premises all materials, equipment, and property of any kind installed by or belonging to Lessee. Any property not removed within Sixty (60) days following termination shall become the property of Lessor."

Although a reversionary interest in the owner would not be conclusive, it would be evidence of the lessors'/owners' future interest which could bear on the question of implied agency. This element (paragraph 21 above) is lacking herein.

If this court were to apply the finding in *Utley* that the owners viewed such improvements to be of substantial benefit to the premises as a whole, it would be inconsistent not only with the terms of the lease, but with the total lack of any other evidence to support its application. It should be noted that the instant record contains evidence that it became necessary to remove the improvements before the successor and current tenant could commence occupancy and operation.

At this juncture, it is worth noting that other cases relied upon by respondents are likewise distinguishable and thus not controlling. *Masterson*, which involved the lease of premises for the specific use or purpose as a "picture house" and granted lessee permission to make any changes his business required, along with evidence that the holder of the life estate (the lien claimants were found not entitled to enforce their liens against the fee) "was frequently on the premises while the alterations were being made by the lessees, made suggestions about the manner of carrying on the work and insisted on some changes being made in the plans" (*Masterson*, 78 S.W.2d at 858) falls well outside the scope of the evidence herein. In the first instance, the lease (paragraph 5 above) sets forth no specific purpose or use. The trial court found that the testimony of Williford was "not credible" and from a reading of the findings of fact, conclusions of law and the judgment entry, the trial court rejected this evidence. This the trial court has authority to do. *Intertherm, Inc. v. Coronet Imperial Corp.*, 558 S.W.2d 344 (Mo.App.1977). The result of the trial court's action in this regard is to leave the instant record devoid of any evidence regarding what, if any, participation there was by the owners or whether, under *Utley*, the owners viewed such improvements to be "of substantial benefit to the premises as a whole". The evidence of the lien claimants disclosed no contact with the owners and no participation by the owners as referenced in *Masterson*. The discard of Williford's testimony on this issue left the trial court with no evidence on this point and thus provides no evidentiary support for a conclusion of implied agency. The declaration by the court that Williford was a successful businessman and the court's expression of its not being so naive as to accept evidence "that an experienced businessman and realtor knowledgeable of the mechanic's lien law would

enter into a lease agreement" does not suffice as a proper basis for the conclusion that A.M.I. was, by implication, the agent of the owners.

*Newport*, a case involving construction of a drive-in restaurant, illustrates four points deemed critical for a finding of implied agency. These were (1) the lease specified that the land was to be used as a drive-in restaurant (i.e., specific purpose); (2) improvements were to revert to the owners at the end of the lease term (see paragraph 21 above); (3) lessees were to carry sufficient insurance to replace buildings in case of loss (protection by way of insurance was, in the instant case the lessee's agreement, in addition to liability insurance to provide insurance coverage for not less than 80% of loss to the building) and (4) the lessee was to make no improvements except those "required" by other portions of the lease. The instant lease contains no such provision.

*Branick*, a case involving remodeling of premises to accommodate a restaurant, included the failure of the owners to offer evidence contesting the existence of an agency relationship between them and their tenants. That is to be contrasted with appellants' evidence admitted herein although rejected by the trial court. In *Branick*, this court pointed out the existence of facts not found herein when it declared at 284:

"... the Taylors were present on the construction site and actually supervised the installation of some of the items after the construction work had progressed to the point of installation of fixtures. They were likewise present during the extensive remodelling and made what amounted to superintending directions to the workmen as to the work to be accomplished."

It is sufficient to state (without repeating the lack of evidence by the lien claimants) that the record in this case reveals no evidence concerning "superintending directions" or any other involvement by the owners in the progress of the work performed.

At this point, it is possible to summarize applicable principles of law, the particular facts and circumstances of the instant case and how these two interrelate. Authority in our state provides that the property interest of a lessor/owner may become encumbered within our mechanic's lien law through the doctrine of implied agency by and upon the actions of his lessee/tenant, provided that the facts and circumstances establish the same. *Mid-West Engineering and Construction Co., supra* and *Masterson, supra*. However, the case authority has pointed out that the mere relationship of landlord and tenant will not suffice. *Ward, Sol Abrahams* and *McGuinn, supra*. In addition, the cases have emphasized "specific purpose" and "use" and the purpose cannot be accomplished except for making the improvements. *Branick, supra*. The cases have also recognized the role of the lessor/owner relative to the changes or improvements to the property as bearing upon the question of implied agency. *Branick, supra*. As was pointed out above and while not conclusive, evidence of a reversionary interest in the lessor/owner would bear on the question of implied agency. Authority exists suggesting that if possible, the intent of the parties should be ascertained from the lease agreement. *Newport* and *Medley, supra*. It has also been held that mere consent for the improvements by the lessor/owner is insufficient, *Ward, supra*, and the improvements must be of a permanent and substantial benefit to the leasehold. *Medley, supra*. It has further been held that the courts can go, and have on occasion gone, beyond the lease agreement and into the whole of the circumstances in determining the existence or the lack of implied agency. *Utley, supra*.

From all of this authority, well established principles have arisen. In summary these are: (a) mere relationship of lessor/lessee does not create agency; (b) at the time of the execution of the lease the lessee must be obligated to make the changes or improvements; (c) the improvements must be of substantial and permanent benefit to the leasehold; (d) mere consent by lessor allowing change or improvements is insufficient; and (e) in ascertain-

ing the requisite intent, both the lease instrument and the whole of the circumstances may be considered.

In the instant case, it is evident that the trial court rejected the testimony of Williford and the trial court was so authorized. *Intertherm, supra.* On the other hand, respondents, as lien claimants, bore the burden of proof to establish the agency relationship between the owners and A.M.I. *Bremer v. Mohr*, 478 S.W.2d 14 (Mo.App. 1972). There is no substantial evidence to reveal any relationship other than landlord and tenant; that A.M.I. was obligated to make the improvements; or that the improvements were of a substantial and permanent benefit to the leasehold. The lease instrument and all other evidence on the record dispels any conclusion that the property was let to A.M.I. for a specific purpose, at least as far as the owners were concerned. In addition, there is no evidence that the owners were even on the property during the construction period or that they were ever involved in any part of the construction of the improvements.

The trial court placed heavy reliance upon the rental abatement and the $20,000 advancement. It is evident from the lease agreement that this was a financing agreement between the owners and A.M.I. Financial assistance does not establish agency. *Philip Carey, supra.* On this point, the only evidence additional to the lease instrument was that of Williford, who explained both the rental abatement and the $20,000 advance. If the evidence stands rejected, this record is totally devoid of any evidence on this point and lien claimants again did not carry their burden of proof.

One more matter has to be addressed. The court based its judgment in part upon a finding and its conclusion that the improvements would last beyond the lease period. The life expectancy of changes or improvements has been a factor considered by our courts. *Ward, supra.* However, this expectancy has been considered relative to the reversionary interest of the lessor/owner and is not a controlling factor standing alone. In the instant case, as has been pointed out, there was no fixed reversionary interest in the owners (see paragraph 21 above), but rather any interest in the improvements arose only upon the failure of A.M.I. to remove the improvements within 60 days following termination of the lease.

In addition to the disposition of that portion of the judgment above relative to Forbes, Royal, Mor-Ford, Fisher and Messina, further disposition is made herein. As regards that portion of the judgment which directs that the judgments in favor of Messina, Lexington, Cody, N.K.C., Mor-Ford and Fisher are to be liens against the real property, that portion of the judgment is reversed as there was no substantial evidence to support a finding of implied agency as between Williford, Sleyster, and Mart as owners/lessors and A.M.I. as tenant/lessee. *S & R Builders & Suppliers, Inc., supra.* The taxation of costs against appellants is set aside. The judgment is in all other respects affirmed.